Filed 6/18/14 Unmodified opinion attached

# IN THE SUPREME COURT OF CALIFORNIA

In re STEVE ALLEN CHAMPION          )
                                    )
on Habeas Corpus.                   )                    S065575
                                    )
_____    )

## ORDER MODIFYING OPINION AND
## DENYING PETITION FOR REHEARING

THE COURT:

The opinion herein, filed April 14, 2014, appearing at 58 Cal.4th 965, is modified as follows:

On page 994, in the first sentence of the third paragraph, delete the words "school records and," so the sentence reads: "The referee found that before petitioner's capital trial, Defense Counsel Skyers reviewed petitioner's CYA medical records, as well as petitioner's criminal history and history as a juvenile offender, and that Skyers did an investigation to determine whether there was some mitigating factor or theme he could present to the jury."

This modification does not affect the judgment.

The petition for rehearing is denied.

# IN THE SUPREME COURT OF CALIFORNIA

In re STEVE ALLEN CHAMPION          )
                                    )
on Habeas Corpus.                   )          S065575
                                    )
_____)

      Petitioner Steve Allen Champion seeks relief on habeas corpus from the judgment of death entered against him in 1982 in Los Angeles Superior Court, case No. A365075.  On direct appeal, we affirmed that judgment and a judgment of death against his codefendant, Craig Anthony Ross.  (*People v. Champion* (1995) 9 Cal.4th 879 (*Champion*).)  In 2002, we issued an order to show cause based on petitioner's allegation, in a petition for writ of habeas corpus, that his trial attorney (Ronald Skyers, now a Los Angeles Superior Court Judge) ineffectively represented him at the penalty phase of trial.  We appointed the Honorable Francisco P. Briseño, Judge of the Orange County Superior Court, as referee, and directed him to take evidence and make findings of fact.  Judge Briseño has done so.  Based on his findings, we deny relief.

## I.  Trial Evidence

      Below is a summary of the evidence at petitioner's capital trial.

      Elizabeth Moncrief, a nurse caring for a neighbor, saw four men forcibly enter the home of Bobby and Mercie Hassan on December 12, 1980.  Later that day, police found the bodies of Bobby Hassan (an unemployed carpenter who sold marijuana)

1

and his 14-year-old son Eric (described by his stepmother Mercie as "handicapped") on a waterbed in the home. Bobby's hands were tied behind his back; each victim had been shot once in the head. Items were missing from the house. At trial, Moncrief identified petitioner and codefendant Craig Anthony Ross as two of the men she had seen entering the Hassan home. On cross-examination, Moncrief admitted that she had previously identified two other men, neither of whom had any connection to petitioner, as two of the intruders. (*Champion*, *supra*, 9 Cal.4th at pp. 898-899.)

When arrested a month after the two murders, petitioner was wearing a ring and a necklace bearing a charm with the king of hearts. Bobby Hassan's wife, Mercie, testified that the ring and the necklace had belonged to her husband. (*Champion*, *supra*, 9 Cal.4th at p. 899.) The prosecution introduced a tape recording of a conversation between petitioner and codefendant Ross in the bus transporting them between the court and the jail after their arrest for the murders. On the bus, the two men spoke briefly of a waterbed; at trial, the prosecution argued that they were referring to the waterbed on which the two Hassans were killed. (*Champion*, *supra*, 9 Cal.4th at pp. 909-910.)

Both Hassans were shot in the back of the head with a .357-caliber bullet with rifling characteristics typical of Colt revolvers. Photographs found in petitioner's home showed petitioner and codefendant Ross each holding a Colt revolver that was either .38- or .357-caliber. Ross's fingerprints were found on Christmas wrapping paper and a white cardboard box at the Hassan home. (*Champion*, *supra*, 9 Cal.4th at pp. 899-900.)

The prosecution also introduced evidence of crimes committed at the home of Cora, Mary, and Michael Taylor, who lived eight blocks from the Hassans. On December 27, 1980, two weeks after the murder of the two Hassans, three Black men invaded the Taylor house looking for drugs, and a fourth man (apparently a lookout)

2

came to the door but did not enter. The men fatally shot Michael (who, like Bobby Hassan, was a marijuana dealer) and one of the men raped Mary. Codefendant Ross's fingerprints were found at the scene. (*Champion*, *supra*, 9 Cal.4th at pp. 900-901.)

Later that same night, a Los Angeles County Sheriff's deputy tried to stop a speeding brown Buick automobile. When the car struck a curb and came to a halt near petitioner's house, the car's occupants (four Black males) ran away, but a sheriff's deputy found Jerome Evan Mallet (Evan Mallet or Mallet) hiding in the back yard of petitioner's home. In the car, the deputy found a tape player and a photograph album stolen from the Taylors and a .357-caliber revolver stolen from the Hassan home. According to a ballistics expert, the bullet that killed Michael Taylor could have been fired by the revolver, which contained two live rounds and an empty shell casing and smelled as if it had recently been fired. (*Champion*, *supra*, 9 Cal.4th at pp. 900-901.)

At trial, Cora and Mary Taylor identified codefendant Ross and Evan Mallet as two of the men who had invaded their home and murdered Michael Taylor, and Mary identified Ross as the one who had raped her. Cora also identified petitioner as one of the perpetrators. Because the Taylors had not previously identified petitioner, he had not been charged with the offenses committed at the Taylor home. (*Champion*, *supra*, 9 Cal.4th at pp. 900-901.)

The prosecution also introduced evidence that a month before the two Hassans were murdered, the body of Teheran Jefferson, a third marijuana dealer who lived in the same block as the Hassans, was found in his home. The upper torso of Jefferson's body was on his bed, while his legs and feet were on the floor. Like Bobby Hassan, his hands were tied behind his back, and (like the Hassans) he had been shot once in the head with a bullet of .38- or .357-caliber. The prosecution produced no evidence

3

(apart from the similarities of the crimes) linking either petitioner or codefendant Ross to Jefferson's death. (*Champion*, *supra*, 9 Cal.4th at p. 917.)

The prosecutor argued to the jury that all of the murders described above were committed by the Raymond Avenue Crips, a criminal street gang operating in the Los Angeles neighborhood where the murders occurred, as part of a plan to kill and rob drug dealers operating on their turf. The prosecution introduced evidence that petitioner, codefendant Ross, and Mallet were members of that gang, and that the brown Buick car tied to the Hassan and Taylor killings was owned by the stepfather of gang members Marcus and Michael Player. (*Champion*, *supra*, 9 Cal.4th at pp. 919-921.)

Petitioner presented an alibi defense, testifying that on the morning that Bobby and Eric Hassan were murdered, he and his brothers, Reginald and Louis, picked up his paycheck from Prompt Service, a "temporary personnel" agency that had employed him. He then went home, where he spent the afternoon. His brother Reginald and his mother Azell corroborated his account. (*Champion*, *supra*, 9 Cal.4th at p. 902.)

The jury convicted both petitioner and codefendant Ross of burglarizing the Hassan home and of robbing and murdering Bobby and Eric Hassan. As to each defendant, the jury found true special circumstance allegations of multiple murder, burglary murder, and robbery murder. The jury also convicted codefendant Ross of numerous felonies, including murder, committed at the Taylor home. In a separate trial held before that of petitioner and codefendant Ross, Evan Mallet was convicted of murder and other felonies at the Taylor home.

At the penalty phase, the prosecution presented evidence that in November 1977, petitioner and seven other youths robbed Vincent Verkuilen, Jerry Stanger, and Laura Surgot at gunpoint at a Greyhound Bus depot in West Covina. The prosecution also

4

presented evidence that in September 1978, petitioner and four other youths approached Jose Bustos and his wife in a park and took their radio. When Bustos tried to retrieve it, petitioner kicked him, hit him on the head with a knife, and cut his finger with a switchblade. Petitioner was a minor when he committed these two offenses. As a result of the second offense he was committed to what was then called the California Youth Authority (CYA), now the Division of Juvenile Facilities of the California Department of Corrections and Rehabilitation, from which he was released on parole less than two months before committing the murders in this case. Petitioner was 18 years old at the time of those murders.

Petitioner's trial attorney, Ronald Skyers, called two penalty phase witnesses: Azell Champion (petitioner's mother) and Thomas Crawford (his CYA parole officer). Petitioner's mother testified that on the day petitioner was arrested for the two murders in this case, he was to start work at Gompers Junior High School in Los Angeles. Parole Officer Crawford said petitioner was cooperative and maintained satisfactory contact during the three months that he was on parole. (*Champion*, *supra*, 9 Cal.4th at p. 904.)

## II. Order of Reference

We asked the referee to take evidence and make findings of facts on these questions:

"1. What actions did petitioner's trial counsel take to investigate potential evidence that could have been presented in mitigation at the penalty phase of petitioner's capital trial? What were the results of that investigation?

"2. What additional mitigating evidence, if any, could petitioner have presented at the penalty phase? How credible was this evidence?

5

"3. What investigative steps, if any, would have led to this additional evidence? In 1982, when petitioner's case was tried, would a reasonably competent attorney have tried to obtain such evidence and to present it at the penalty phase?

"4. What circumstances, if any, weighed against the investigation or presentation of this additional evidence? What evidence damaging to petitioner, but not presented by the prosecution at the guilt or penalty trials, would likely have been presented in rebuttal if petitioner had introduced this evidence?

"5. Did petitioner do or say anything to hinder or prevent the investigation or presentation of mitigating evidence at the penalty phase, or did he ask that any such evidence not be presented? If so, what did he do or say?"

Below, we summarize the referee's findings regarding these questions, and we address the exceptions taken by the parties to those findings.

## A. What actions did petitioner's trial counsel take to investigate potential evidence that could have been presented in mitigation at the penalty phase of petitioner's capital trial? What were the results of that investigation?

### 1. Referee's findings

The referee's findings on this question pertained to three categories of potentially mitigating evidence: (1) evidence pertaining to the charged offenses (the murders of Bobby and Eric Hassan); (2) evidence responding to the prosecution's aggravating evidence, which consisted of the two felonies (robbery and aggravated assault) petitioner committed as a juvenile, the crimes committed at the Taylor home (hereafter the Taylor crimes), and the murder of Teheran Jefferson;[1] and (3) evidence pertaining to petitioner's social history, development, and mental functioning.

---

[1] The evidence pertaining to the Taylor crimes and the murder of Teheran Jefferson was presented at the guilt phase, not the penalty phase. But the trial court's instructions permitted the jury to consider, at the penalty phase, evidence of

6

With regard to the first category of potentially mitigating evidence —evidence pertaining to the murders of Bobby and Eric Hassan — the referee found that Defense Counsel Skyers had read the discovery provided by the prosecution, visited the crime scene as well as petitioner's home and Helen Keller Park (which was across the street from the Hassans' home and was the scene of certain events relevant to the Taylor crimes, discussed in pt. II.B.2.a., *post*), and spoke with petitioner and those members of petitioner's family who were potential witnesses. Skyers did not independently investigate or interview the prosecution witnesses. Skyers, the referee said, knew that the prosecutor had no evidence that it was petitioner who shot the Hassans, but he also was aware that the egregious nature of the murders — the execution-style shooting of a man and his 14-year-old son — would place, in the referee's words, "an almost insurmountable burden on any reasonable trial attorney in identifying and presenting . . . mitigation."

As to the second category of potentially mitigating evidence — evidence refuting the prosecution's aggravating evidence — the testimony at the posttrial reference hearing focused primarily on the Taylor crimes. (See pp. 2-3, *ante*.) As previously explained (*ibid*.), petitioner was not charged with those crimes, but codefendant Ross was, and at the guilt phase of trial prosecution witness Cora Taylor identified petitioner as one of the perpetrators. The referee found that Defense Counsel Skyers had reviewed the discovery he received from the prosecution pertaining to those crimes, but that he conducted no independent investigation to determine whether he could present evidence that petitioner was not one of the perpetrators. The referee noted that Skyers was unsure whether he had even asked petitioner about an alibi. Skyers did not attend the trial of Evan Mallet, who was

aggravating circumstances that had been presented at the guilt phase. (See *Champion*, *supra*, 9 Cal.4th at p. 946.)

charged with the Taylor crimes and whose trial occurred before that of petitioner and Ross, nor did he read the transcripts of Mallet's trial.

As to the murder of Teheran Jefferson, the referee found that Defense Counsel Skyers had read the police reports provided by the prosecution and visited the crime scene, but that he did no additional investigation (such as contacting witnesses identified in the police reports, conducting ballistics tests on the bullet found in Jefferson's body, and investigating the extent to which the Jefferson murder resembled the murders of the two Hassans and of Michael Taylor).

With respect to the two felonies petitioner committed as a juvenile, the referee found that Skyers had read the discovery furnished by the prosecution, and the referee noted that the "main mitigation" pertaining to these offenses was "petitioner's age and lack of maturity."

Turning to the third category of potentially mitigating evidence — evidence pertaining to petitioner's social history, development, and mental functioning — the referee found that Defense Counsel Skyers had reviewed petitioner's CYA records, which the referee described as documenting "petitioner's conduct within a structured setting." The records contained reports by two psychologists and two psychiatrists, all of whom concluded that petitioner had no mental illness, defect, or disorder. Skyers also reviewed a report jointly prepared by two psychiatrists (Dr. Seymour Pollack and Dr. Lillian Imperi) appointed by the trial court at the request of Skyers's predecessor, Homer Mason, to evaluate petitioner's mental health. Drs. Pollack and Imperi, like the mental health professionals at CYA, found no evidence that petitioner suffered from any mental illness, defect, or disorder.

Defense Counsel Skyers, the referee found, had interviewed petitioner and visited his home, where Skyers talked to petitioner's mother, older sisters, and one of his two older brothers about petitioner's home life, childhood, and other family

8

matters. Skyers did not interview petitioner's older brother Lewis or his younger siblings, nor did he contact members of petitioner's extended family who lived nearby. The family did not tell Skyers that petitioner had suffered fetal abuse, an alleged 1968 head injury, head trauma inflicted by older brothers, and extreme family poverty, topics that family members testified to at the posttrial reference hearing.

The referee found that Defense Counsel Skyers "did not adequately conduct a separate, independent [penalty] investigation"; that he "failed to retain a penalty phase investigator"; that he "did not interview all potential mitigation witnesses including petitioner's teachers, friends, CYA staff, CYA doctors, fellow gang members or law enforcement personnel"; and that he "did not assemble all documents" pertaining to the penalty phase, including "school records and . . . [Evan] Mallet's trial transcripts."

The Attorney General does not dispute the referee's findings. Petitioner, however, takes exception to two findings that he alleges the referee made, which we address below.

### 2. Exceptions to the referee's findings

First, petitioner asserts: "There is no basis for the referee's finding that [Defense Counsel Ronald] Skyers obtained a penalty phase evaluation from [psychiatrist Seymour] Pollack." Petitioner does not give a page citation for any such finding in the referee's report, and we cannot locate any such finding. The referee correctly stated: "The record is clear that Skyers did not specifically ask Dr. Pollack to conduct a social history evaluation of petitioner's life for the specific purpose of developing potential penalty phase evidence."

Second, petitioner takes exception to the referee's finding that Defense Counsel Skyers reviewed the mental health evaluations of petitioner prepared at CYA when petitioner was incarcerated there. Petitioner points out that Skyers testified at the posttrial reference hearing that he could not remember whether he had reviewed

these evaluations, and that Skyers's case file did not contain copies of the evaluations. Skyers's lack of recall is not surprising, because the hearing occurred more than two decades after petitioner's capital trial. But materials in Skyers's case file indicate that he did review the evaluations: A file note states that Skyers spoke to a person at the parole office who said that Skyers needed authorization from petitioner to see petitioner's CYA file, the file contains an authorization petitioner signed three days after the date of the note, and another file note gives the address of the CYA parole office where a review logically would have occurred. Based on this circumstantial evidence, we agree with the referee that Skyers most likely reviewed the CYA mental health evaluations.

## B. What additional mitigating evidence, if any, could petitioner have presented at the penalty phase? How credible was this evidence?

### 1. Referee's findings

Regarding the circumstances surrounding the charged murders of Bobby and Eric Hassan, the referee found that petitioner failed to show that Defense Counsel Skyers could have presented any additional mitigating evidence. The referee also found that petitioner produced no mitigating evidence that the defense could have presented pertaining to the murder of Teheran Jefferson (evidence of which was presented by the prosecution at the guilt phase of petitioner's capital trial), or to the two felonies petitioner committed as a juvenile (evidence of which was presented by the prosecution at the penalty phase).

With respect to the Taylor crimes, the referee concluded that the defense could have presented alibi evidence tending to show that petitioner was not at the Taylor home on the night of the crimes. (We summarize this evidence in pt. II.B.2.a., *post*.) But the referee also found that the witnesses who testified to this alibi at the posttrial

10

reference hearing were, like petitioner, members of the Raymond Avenue Crips, a criminal street gang. Their testimony, the referee said, was "inconsistent with their own declarations, with each other and with petitioner's own trial testimony," and was "not credible." Presentation of such alibi evidence at the penalty phase, the referee concluded, would not have assisted petitioner, as it would have confirmed petitioner's gang membership (which petitioner had denied in his guilt phase testimony) and his close association with codefendant Ross, whose guilt of the Taylor crimes was overwhelmingly shown.

With respect to petitioner's social history, development, and mental functioning, petitioner presented evidence at the posttrial reference hearing that he suffered from brain damage, that he was traumatized by the death of a man who acted as a father figure toward him, that he performed poorly in school, that he was physically abused by various family members, that he grew up in impoverished circumstances, that he was amenable to rehabilitation and institutional adjustment, and that he was loved by his family and friends. As explained below, the referee found that some of this evidence was credible but some was not.

With respect to petitioner's allegation that Defense Counsel Skyers could have presented evidence of petitioner's brain damage, the referee found the claim "not supportable." The referee noted that two psychologists and two psychiatrists at CYA, and two psychiatrists retained by Homer Mason (Defense Counsel Skyers's predecessor as petitioner's trial attorney), and two mental health experts (a clinical psychologist and a forensic psychiatrist) who testified for the prosecution at the posttrial reference hearing all found no evidence that petitioner was neuropsychologically impaired. Although petitioner claimed he could have suffered brain damage as a result of alleged fetal abuse, a traffic accident, or beatings allegedly inflicted by his older brothers, the referee found that petitioner did not suffer brain

11

damage as a result of any of these events. The referee further found that, in view of the mental health examinations described above, all of which found no evidence of psychological impairment, Defense Counsel Skyers "did not have any reason to order any additional evaluations," and "no trial attorney could be faulted for not asking for further testing or concluding that no mitigating evidence existed at the time of trial as to petitioner's mental status."

With regard to petitioner's performance in school, the referee found that records from petitioner's school and from CYA showed that petitioner had "a low IQ, low intellectual functioning, reading and learning difficulties, attention deficits, a flat affect, deficiency in ability to conceptualize, low self-esteem, impulsiveness and a bad temper." This evidence, the referee found, was "credible and available at time of trial."

As to the economic circumstances of petitioner's family, the referee rejected as lacking in credibility the evidence presented by petitioner that he grew up in extreme poverty, that he suffered from malnutrition and deprivation of childhood necessities, and that he was beaten by his older brothers. The referee found, however, that when petitioner's mother was working, "her absence from the home resulted in her inability to provide proper care, guidance, and supervision to petitioner."

With respect to petitioner's family and upbringing, the referee found that petitioner's biological father was physically abusive, but that he abandoned the family before petitioner was born. Petitioner's mother soon became romantically involved with Gerald Trabue, Sr., who was the primary father figure in petitioner's life from the time of his birth until he was six years old, when Trabue was killed in a traffic accident. Trabue, the referee found, was a "wonderful person and provider" and his death "had a devastating impact on petitioner's family": Petitioner's mother became depressed and the family temporarily experienced "major financial difficulties."

12

Trabue's death "adversely impacted" petitioner, who "did not have another father figure afterwards." These matters, the referee found, could have been presented by counsel had it not been for the failure of members of petitioner's family to disclose them to Defense Counsel Skyers.

With respect to petitioner's amenability to rehabilitation and institutional adjustment, the referee found that the evidence was mixed: Some CYA reports said that petitioner had complied with CYA rules and regulations, did well in his classes, was respectful to staff, and performed well in a structured setting. But the referee found that petitioner's participation in the murders of Bobby and Eric Hassan less than two months after his release from CYA "nullify this mitigation," and other CYA reports mentioned incidents of violent conduct while petitioner was at CYA.

With respect to love and support from family and friends, the referee found that the testimony of petitioner's mother, while lacking credibility in many respects, indicated her love and affection for petitioner, and that at the trial's penalty phase Defense Counsel Skyers should have called her to testify about her feelings for petitioner. The referee also found that other family members and childhood friend Gary Jones, had they been called as witnesses at trial, could have credibly testified that they loved and cared for petitioner.

The Attorney General does not dispute the referee's findings. Petitioner takes exception to 11 findings. We divide his exceptions into two categories. First, we address his exceptions pertaining to the referee's findings regarding mitigating evidence that might have been presented to counter the prosecution's aggravating evidence (the murders of Bobby and Eric Hassan, the Taylor crimes, the murder of Teheran Jefferson, and the crimes committed by petitioner as a minor). Second, we consider petitioner's exceptions pertaining to the referee's findings regarding

13

mitigating evidence pertaining to petitioner's social history, development, and mental functioning.

**2. Exceptions to referee findings pertaining to the prosecution's aggravating evidence**

> *a. "The reference court erred in finding petitioner's lay witnesses not credible."*

At the posttrial reference hearing, petitioner presented alibi evidence tending to show that he did not commit the Taylor crimes, but the referee found that crucial alibi witnesses were not credible. Petitioner challenges this finding. To evaluate his claim, we review the pertinent evidence presented at petitioner's capital trial, after which we summarize the alibi evidence presented at the reference hearing.

Between 11:00 p.m. and midnight on December 27, 1980, three Black males invaded the Taylor home looking for drugs, and a fourth Black male (apparently a lookout) came to the door but did not enter. The men ransacked the home, stole a tape player and a photograph album, and fatally shot Michael Taylor. One of the men raped Mary Taylor.

Shortly after the murder, a Los Angeles County Sheriff's deputy tried to stop four Black males in a brown Buick car that did not have its headlights on and was near Helen Keller Park, within half a mile of the Taylor home. The Buick took off at high speed, struck a curb, and came to a halt near petitioner's home; its occupants ran away. In the car, deputies found a tape player and a photograph album stolen from the Taylor apartment, as well as a revolver stolen from the Hassan home that, a prosecution expert concluded, probably fired the bullet that killed Michael Taylor. In the back yard of petitioner's home, the deputies found Evan Mallet, who was later identified as one of the perpetrators of the Taylor crimes. Thus, it is likely that the occupants of the brown Buick committed those crimes.

14

Petitioner testified at the guilt phase of his capital trial, denying that he was one of the men who murdered Bobby and Eric Hassan, but on direct examination he did not mention the Taylor crimes. On cross-examination, the prosecutor asked petitioner where he was on the night of those crimes. Petitioner said he was home between 10:00 and 11:00 p.m., but that he left between 11:00 and 11:30 p.m. and stayed out until after midnight. He said that during that time (but after the crash of the brown Buick) he was detained by sheriff's deputies. Petitioner's mother, when asked on cross-examination where petitioner was that night, said he was at home.

At the posttrial reference hearing, petitioner's alibi witnesses — Marcus Player, Wayne Harris, and Earl Bogans — testified that petitioner was playing basketball in Helen Keller Park at the time of the Taylor crimes. Their testimony also tended to implicate Robert Simms rather than petitioner as the one who, along with Craig Ross and Evan Mallet, committed the Taylor crimes. We summarize the alibi witnesses' testimony below.

Marcus Player testified that on the night in question he was at his fiancée's house, but between 10:00 and 11:00 p.m. he walked to a liquor store to buy some orange juice or milk. On his way, he saw a group of people, including petitioner and Wayne Harris (Player's cousin), at the basketball court in Helen Keller Park, and he spoke with them for half an hour. He then went to the liquor store to make his purchase. On the way back to his fiancée's house, sheriff's deputies detained him. Petitioner and Harris were not with him at the time. While Player was being detained, a brown Buick that Player recognized as belonging to his stepfather entered the park, and the deputies left him to chase it.

Hearing the Buick crash, Player, joined by petitioner and Harris, went to see what had happened. Sheriff's deputies then detained and questioned them. Player told the deputies that the car belonged to his stepfather and that he had last seen it

15

being driven by his brother Michael. The deputies ordered Player, petitioner, and Harris to walk to the location of another patrol car. While they were walking there, they were joined by a youth that Player knew only by the name "Lil Owl." The deputies at the second car ordered them to sit on a curb for approximately half an hour, during which time a police car came by and shone a spotlight on them. Eventually, the deputies took Lil Owl into custody and allowed Player, Harris, and petitioner to go to petitioner's home.

Wayne Harris testified that on the night in question he and petitioner, along with a dozen other youths, played basketball until about 10:30 p.m., when they left to go to the store. As they walked, sheriff's deputies arrived at the park and detained several youths, not including petitioner and Harris.[2] While the detentions were occurring, a brown Buick came into the park, then sped away, apparently after its occupants saw the deputies. The deputies gave chase. Harris, petitioner, and Marcus Player then started walking west on 126th Street, noticing that the Buick, which Harris recognized as belonging to the Player family, had crashed. Shortly thereafter, sheriffs' deputies detained the trio and ordered them to walk to another sheriff's department vehicle. As they walked, Lil Owl joined them. When they reached the second sheriff's vehicle, the deputies questioned the youths and checked their pulse rates by placing a hand on each of their chests. Eventually they took Lil Owl away and allowed petitioner, Player, and Harris to go to petitioner's home.

Earl Bogans testified that on the night in question he arrived at Helen Keller Park between 7:00 and 7:30 p.m. There, he played basketball with petitioner, Marcus Player, and other youths for about 90 minutes, after which they sat in the parking lot

---

[2] Harris acknowledged that he had signed a 1997 declaration stating he, petitioner, and Marcus Player, had been detained in the park by the deputies, and held for four hours, but he did not recall making the statements attributed to him in the declaration.

16

smoking marijuana.  About 10:00 p.m., two patrol cars drove up.  The sheriff's deputies inside told the youths to lie on their stomachs.  Suddenly a brown car entered the parking lot and quickly backed out again, and the deputies left to chase it.  Bogans then went home.

Sheriff's reports prepared at the time of the murder and testimony of sheriff's deputies at the posttrial reference hearing corroborated *parts* of the testimony of Player, Harris, and Bogans.  According to the reports and testimony, sheriff's patrol cars went to Helen Keller Park shortly before midnight on the night of the Taylor crimes, responding to a call of a gang-related disturbance.  There, the deputies detained four Black males.  When the chase of the brown Buick began, the deputies left the park and joined in the chase.  After the Buick crashed, deputies set up a perimeter to try to contain the Buick's passengers within a four-block area around the crash site.

At 12:30 a.m., petitioner, Marcus Player, and Wayne Harris were detained by sheriff's deputies when they walked into the containment area.  The deputies filled out field interrogation cards and told the three to walk to another command post in the containment area and identify themselves.  When they arrived at the second post, they were accompanied by a 16-year-old youth who falsely identified himself as "James Taylor" (apparently Lil Owl).  There, sheriff's deputies again detained them and filled out field identification cards, after which the deputies released petitioner, Player, and Harris.  Because "Taylor" had joined the other three in the containment area and because his appearance and clothing closely resembled one of the four Black males former Deputy Sheriff (now Attorney) Theodore Naimy had seen in the brown Buick, he was taken to a sheriff's station where deputies determined that his true name was Robert Simms.  Simms was eventually released without being charged.

17

But the deputies' reports and testimony neither confirmed nor disproved the testimony of Player, Harris, and Bogans that petitioner was in Helen Keller Park at the time of the Taylor crimes. A report prepared by Sergeant Owen Tong listed the names of the youths who were being detained in the park by the deputies when the chase of the brown Buick began; the list included Player and Bogans, but *not* petitioner. Thus, Player, Harris, and Bogans were the only witnesses whose testimony at the posttrial reference hearing gave petitioner an alibi for the Taylor crimes. But these three witnesses all were members of the Raymond Avenue Crips, as petitioner was.

At the time of the posttrial reference hearing, both Player and Bogans were in prison: Player had been convicted of first degree murder, and Bogans had been convicted of robbing an armored car. Harris was not in custody, but he had convictions for robbery and kidnapping. Bogans also had shown a willingness to commit perjury on behalf of a fellow gang member. He admitted that after Evan Mallet was convicted of murdering Michael Taylor, Mallet telephoned Bogans and said he was sending Bogans a declaration that could help Mallet get out of jail. In the mail, Bogans received a blank declaration form that he signed and returned to Mallet, allowing Mallet to write whatever he liked in the declaration.

The referee found that the alibi testimony of Player, Harris, and Bogans was not credible. Petitioner takes exception to this finding. He argues that Marcus Player "had no reason to lie for petitioner because, thinking petitioner only faced the Hassan charges, he did not realize the importance of his information to petitioner's defense." Petitioner acknowledges that the testimony of the three alibi witnesses was inconsistent in certain respects; he argues, however, that such discrepancies do not show a lack of credibility, asserting that the discrepancies are most likely attributable

18

to the circumstance that the posttrial reference hearing was held decades after the events in question.

Because the referee had an opportunity to observe the demeanor of Player, Harris, and Bogans when they testified, we give "great weight" to his determination that their testimony lacked credibility. (*In re Price* (2011) 51 Cal.4th 547, 559.) Moreover, their credibility is suspect because all three were members of petitioner's gang — and thus had a substantial motive to give testimony that would assist petitioner — and because all three had been convicted of very serious crimes that reflect adversely on their credibility. Furthermore, their reference hearing testimony and petitioner's testimony at trial differed in several significant respects: (1) Petitioner testified that he was at home most of the evening and did not leave before 11:00 p.m., whereas Harris, Bogans, and Taylor testified that he was playing basketball in Helen Keller Park during the time petitioner claimed to be at home; (2) petitioner denied that he was a member of the Raymond Avenue Crips, whereas Harris and Bogans said he was in the gang; (3) petitioner and Harris denied that they were detained by sheriff's deputies in Helen Keller Park just before the brown Buick entered the park, whereas Bogans said they were detained. For all of these reasons, substantial evidence supports the referee's finding that the witnesses were not credible.

> b. *"The referee erred in finding that Marcus Player would have been unavailable to Skyers in support of petitioner's defense against the allegation that he was involved in the Taylor Murder."*

At the posttrial reference hearing, Marcus Player gave alibi testimony on petitioner's behalf. (See pt. II.B.1.a., *ante*.) The referee found, however, that Player "would not have cooperated with trial counsel in any effort to develop and present an alibi through his testimony," and that if Player had been called to testify at petitioner's

19

capital trial, he would have invoked his privilege against self-incrimination to avoid prosecution as an accessory after the fact, based on his efforts to assist codefendant Craig Ross in evading arrest. The referee noted that at the time of petitioner's trial, Player was awaiting trial on an unrelated charge of murder, of which he was later convicted.

Petitioner takes exception to the referee's finding. He notes that Player was not arrested until more than four months after Defense Counsel Skyers began his representation of petitioner, so Skyers could have spoken to Player before his arrest. Moreover, petitioner notes, Player testified at the posttrial reference hearing "that he was not fearful of a perjury charge because he had nothing to do with the Taylor crimes." But Player also testified at the reference hearing that if he had been contacted by an attorney representing petitioner at the time of petitioner's trial he would not have spoken to the attorney, and that he would not have willingly testified at petitioner's trial. Based on this testimony, we agree with the referee's finding.

> c. *"The referee errs in failing to find that Simms's fingerprint would have been available at the time of petitioner's trial."*

As previously noted (see pt. I., *ante*), Cora and Mary Taylor testified at petitioner's capital trial that three men invaded their home on the night of December 27, 1980, and that the men raped Mary and fatally shot Michael Taylor (Cora's son and Mary's brother). At the posttrial reference hearing, petitioner attempted to show that Defense Counsel Skyers should have discovered and presented evidence that the three men were codefendant Craig Ross, Evan Mallet, and Robert Simms, and thus that petitioner could not have been one of the men.

Simms, it will be recalled (see pt. II.B.2.a, *ante*), was detained by sheriff's deputies on the night of the murder when he, accompanied by petitioner, Wayne Harris, and Marcus Player, was found inside the containment zone established by the

20

police around the location where the brown Buick car had crashed while being pursued by the deputies. At the time of his detention, Simms falsely identified himself as James Taylor. When Cora and Mary Taylor were brought to the location of the detained suspects for a field showup, they could not identify any of the four. Simms was then taken to a sheriff's station, where his true identity was ascertained. At the station, Theodore Naimy, one of the deputies in the patrol car that had been chasing the Buick, observed Simms. Based on height, weight, age, and clothing, Naimy thought that Simms resembled one of the men he had seen running from the car, but he was uncertain of his identification. Simms, who was 16 years old, was released without being charged with the Taylor crimes.

During the posttrial reference hearing, an exemplar set of Simms's fingerprints, obtained by the police when Simms was arrested in 1987 (five years after petitioner's capital trial) on an unrelated matter, was compared with the latent prints in the Taylor home. The parties stipulated that one of the fingerprints matched a latent print found on a metal box in the Taylor home's kitchen. At the reference hearing, petitioner argued that Defense Counsel Skyers should have discovered the fingerprint match and presented evidence of it at petitioner's trial to show that petitioner was not one of the perpetrators of the Taylor crimes.

But Defense Counsel Skyers could only have discovered and presented such evidence if he could have obtained an exemplar of Simms's fingerprints from law enforcement officials so that he could have asked an expert to compare it to the latent prints found at the Taylor home. By the time of the posttrial reference hearing (which began in 2006), any such exemplar no longer existed, and there was no way to determine whether one had existed at the time of trial. The referee found that petitioner had not shown that Simms's fingerprints had been available to Skyers.

21

Petitioner challenges this finding. According to petitioner, "Simms was arrested and booked into jail" and "[t]he booking process in [Los Angeles] county jails required taking fingerprints." Thus, he asserts, the deputies must have taken Simms's fingerprints, and Defense Counsel Skyers could have obtained them from the prosecution through pretrial discovery. But petitioner presented no records showing that Simms was booked into the jail, and it is unlikely that he was, because he was a juvenile. (See Welf. & Inst. Code, former § 207, subd. (a), as amended by Stats. 1979, ch. 373, § 347, p. 1387 ["No . . . peace officer shall knowingly detain in any jail or lockup any person under the age of 18 years, unless a judge of the juvenile court shall determine that there are no other proper and adequate facilities for the care and detention of such person . . . ."].) Although it is possible that the deputies obtained Simms's fingerprints even without booking him into the jail, we doubt that they did so: If the fingerprints had been obtained, the prosecution (which was seeking to apprehend everyone responsible for the Taylor crimes), would most likely have compared them with those found at the Taylor home. Thus, we accept the referee's finding that petitioner failed to show that Defense Counsel Skyers could have obtained Simms's fingerprints at the time of petitioner's trial.

> ### d. "The referee errs in concluding that petitioner's defense evidence was not credible."

As described in part II.B.2.a., *ante*, at the posttrial reference hearing petitioner presented evidence tending to show that he did not participate in the Taylor crimes. According to petitioner, the referee found that the evidence "did not necessarily eliminate petitioner as a perpetrator *and for that reason reasonably competent counsel would not have presented it*." (Italics added.) Petitioner disputes this finding by the referee, pointing out that to prevent the jury from considering the Taylor crimes as evidence in aggravation at the penalty phase, counsel only had to raise a reasonable

22

doubt as to whether petitioner committed those crimes; he did not have to conclusively establish petitioner's innocence of those crimes. But the referee did not base his finding that reasonably competent counsel would not have presented the alibi evidence solely on the inconclusiveness of this evidence. Rather, the referee found that competent defense counsel would not have presented the alibi evidence because the alibi witnesses would have contradicted petitioner's guilt phase testimony about his whereabouts on the night of the Taylor crimes, would have confirmed petitioner's gang membership (which petitioner denied in his guilt phase testimony), and would have contradicted petitioner's claims at the posttrial reference hearing that he had brain damage and grew up in impoverished circumstances. Petitioner does not refute these reasons given by the referee for his finding.

> e. "The referee errs in finding that petitioner presented no evidence at the hearing rebutting any alleged connection between petitioner and the Jefferson murder."

The referee found that "petitioner did not present any additional mitigation or rebuttal evidence as to the Jefferson murder" at the posttrial reference hearing. Petitioner takes exception to this finding, citing the reference hearing testimony of Steven Strong, hired by petitioner as a private investigator. Strong had previously worked for the Los Angeles Police Department for 20 years; his service included many years as a detective focusing on criminal street gangs and several years as a homicide detective. In 1979 and 1980, he investigated narcotics offenses committed by the Raymond Avenue Crips, and he had made extensive contacts with members of that gang while working undercover.

According to investigator Strong, the available evidence pertaining to the murder of Teheran Jefferson indicated that it was a drug-related slaying, not a gang-related slaying, and there was nothing unique or unusual about the murder. He

23

conceded, however, that the same was true of the slayings of Bobby and Eric Hassan, and that Jefferson's home was in the same block as the Hassan home. He acknowledged that Jefferson, like the Hassans, was killed with a .38- or .357-caliber weapon, but he did not regard that fact as particularly significant, noting that ".38's and .357 caliber revolvers were very commonplace" in South Central Los Angeles at the time of the 1980 murders.

In response to this exception asserted by petitioner, the Attorney General attacks investigator Strong's credibility, asserting that Strong was not provided with and did not review certain "important materials relevant to his opinions" and that he used "patently defective reasoning."

We agree with petitioner that, contrary to the referee's finding, he did present evidence about Jefferson's murder. But petitioner's evidence did not consist of *facts* that were not presented at trial; rather, it consisted only of investigator Strong's *evaluation* of those facts. We see no need to determine the merits of the Attorney General's attack on the credibility of Strong's evaluation because, as explained below, it is highly unlikely that the jury considered Jefferson's murder as an aggravating circumstance at the penalty phase of petitioner's capital trial.

At the penalty phase, the trial court correctly instructed the jurors that they could consider evidence that petitioner had engaged in violent criminal conduct other than the murders of which he was convicted only if they found beyond a reasonable doubt that petitioner had engaged in that conduct. No reasonable juror could have made such a finding with regard to the murder of Teheran Jefferson.

True, Jefferson's killing resembled the murders of Bobby Hassan and Michael Taylor in a number of respects: Each victim was a marijuana dealer, each was murdered in his home, they all lived in the same neighborhood, each was shot with a .38- or .357-caliber weapon, and the killings all took place within a two-month period.

24

Although these similarities are circumstantial evidence tending to show that Jefferson, like the Hassans and Michael Taylor, was murdered by members of the Raymond Avenue Crips, they do not demonstrate beyond a reasonable doubt that petitioner was *personally* involved in the killing of Jefferson. In his closing argument at the penalty phase, the prosecutor did not rely on the Jefferson murder as a circumstance in aggravation; instead, he told the jury that it could consider that murder only if it found beyond a reasonable doubt that petitioner had committed it, and said that he would "not belabor that by asking you for a finding at this time." In these circumstances, no reasonable juror would have regarded Jefferson's murder as an aggravating circumstance.

### f. "The referee erred in not recognizing that petitioner presented evidence mitigating his involvement in the juvenile offenses . . . ."

The referee found that "[p]etitioner made no showing that any mitigating evidence existed at the time of the trial" as to the two felonies in which petitioner participated as a juvenile, evidence of which was presented to the jury at the penalty phase of his capital trial. Petitioner takes exception to this finding, citing psychologist Deborah Miora's testimony at the posttrial reference hearing. Dr. Miora explained that after the death of Gerald Trabue, Sr., who was like a father to petitioner until his death in a car accident when petitioner was six years old, petitioner grew up without a strong, nurturing father figure, in a family traumatized by Trabue's death. As a result, petitioner became involved with a criminal street gang, the Raymond Avenue Crips, when he was 11 years old. According to Dr. Miora, participation in the gang "meant having a sense of family, being part of a group, being taken in, being paid attention, being cared for in a way [when] he had felt lost at home and not recognized." The gang, Miora said, gave petitioner "a feeling of belonging, a feeling that somebody was really looking after him and cared about his whereabouts." This evidence, petitioner

25

asserts, mitigated the two felonies, which he committed with other members of that group. We disagree.

Dr. Miora's testimony provides a possible explanation as to why petitioner joined the Raymond Avenue Crips. But not all members of that gang committed violent crimes. Petitioner's best friend, Gary Jones, testified that he too had been a member of the Raymond Avenue Crips, but that his gang-related activities consisted only of drinking beer, smoking marijuana, and protecting other gang members in fights with rival gangs. Thus, Dr. Miora's testimony does not explain why petitioner, as a juvenile, participated not only in an armed robbery of three persons, but also committed an assault with a knife on a man who was picnicking in a park with his family.

> g. *"Given that gang affiliation was a noticed aggravator, the referee erred in refusing to fund a gang expert, thereby preventing petitioner from fully exploring gang related issues and presenting relevant mitigating evidence on this subject."*

Petitioner asserts that the referee erred by denying his requests for funds to retain a gang expert, but he makes no attempt to support this bald assertion: He provides no record citations showing that he requested such funds; that the request, if any, was accompanied by an offer of proof; or that the referee denied the alleged request. Nor does petitioner provide any argument or case authority in support of his contention. We therefore do not consider this claim. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793 [a court need not consider a claim that is accompanied by neither argument nor authority].) We note, moreover, that petitioner did hire a gang expert, investigator Steven Strong, who testified on his behalf at the posttrial reference hearing, and that psychologist Deborah Miora testified as to petitioner's reasons for joining the Raymond Avenue Crips street gang.

26

h. *"The referee errs in finding that petitioner presented no evidence to support claims that if Skyers had properly investigated the taped conversation between Ross and petitioner he could have shown that the transcript was deficient or incorrect and mitigated the contents and impact of the recorded conversation."*

As previously noted (see pt. I, *ante*), at the guilt phase of petitioner's capital trial the prosecution introduced a tape recording of a conversation between petitioner and codefendant Ross that occurred in a van transporting them between jail and the courthouse. In the conversation, petitioner and Ross talked about "blow[ing] up" the driver of the transport van and escaping, and petitioner laughed when talking about murder victim Bobby Hassan and his son, Bobby, Jr., who had been in the audience in court. At the penalty phase, the prosecutor cited this conversation as evidence that petitioner lacked remorse for the murders.

The referee found: "Petitioner did not present any evidence [at the posttrial reference hearing] to support the claims that if [defense counsel] Skyers had properly investigated the taped conversation between Ross and petitioner he could have shown that the transcript was deficient or incorrect. No mitigating evidence [on this issue] was presented by petitioner."

Petitioner takes exception to this finding, claiming that he "presented evidence that there were numerous plausible explanations to counter arguments the prosecutor made regarding the taped conversation . . . ." But the testimony he cites to support this assertion is that of Jack Earley, a criminal defense attorney called by petitioner as an expert witness, who said that Defense Counsel Skyers "didn't deal with" the tape recording. Earley described some steps that a reasonably competent attorney could have taken to address the issue, such as having petitioner evaluated by a psychologist and determining whether petitioner was a leader or a follower. But Earley did not describe any mitigating evidence the defense could have presented at trial on the

27

issue, nor did he state that the transcript was deficient or incorrect. We therefore conclude that the record supports the referee's finding on this point.

**3. Exceptions to the referee's findings pertaining to petitioner's social history, development, and mental functioning.**

> *a. "The referee erred in rejecting Dr. Riley's conclusion that petitioner, as of the time of his trial in 1982, suffered from longstanding neuropsychological dysfunction."*

At the posttrial reference hearing, petitioner attempted to show through the testimony of clinical neuropsychologist Nell Riley that petitioner's trial counsel could have presented evidence that petitioner suffered from neuropsychological dysfunction at the time of the Hassan murders. Dr. Riley testified that in 1997 she gave petitioner a standard Intelligence Quotient (IQ) test, the results of which showed that petitioner had a verbal IQ of 92 (which placed him in the 30th percentile) and a performance IQ of 74 (which placed him in the fourth percentile). At the time of petitioner's capital trial, Riley testified, the scientific community considered a discrepancy of this magnitude between the verbal IQ and the performance IQ to be a marker of brain dysfunction.[3] She also administered a series of tests called the Halstead Reitan Battery, which were used at the time of petitioner's trial to measure seven components of brain dysfunction. According to Dr. Riley, the tests showed petitioner was in the impaired range in all seven components, and only two out of every 10,000 persons are in the impaired range in all seven categories.

In Dr. Riley's view, petitioner had neuropsychological deficits in "problem solving, nonverbal reasoning, attention, and . . . information processing." These

---

[3]    Because petitioner was attempting to show that trial counsel should have presented evidence of petitioner's brain damage, Dr. Riley described the tests that could have been administered at the time of petitioner's trial and the results that would have been derived from those tests. Different (and presumably more accurate) tests are now used.

28

deficits, she said, caused him to be "unable to draw inferences in ambiguous circumstances and . . . especially vulnerable to missing or misleading cues concerning the intentions of other persons"; they also impaired "his ability to comprehend the whole situation and make decisions." Dr. Riley cited as possible causes of petitioner's impairments the facts that petitioner was in an automobile accident when he was a child and his mother's physical abuse at the hands of petitioner's father while she was pregnant with petitioner.

To rebut Dr. Riley's testimony, the prosecution called forensic psychiatrist Saul Faerstein and neuropsychologist Charles Hinkin. Drs. Faerstein and Hinkin both concluded, based on the reports of the six mental health experts who had examined petitioner before trial (four at CYA, and two on behalf of the defense), that petitioner does not suffer from brain damage, and that there had been no reason for Defense Counsel Skyers to have a neuropsychologist examine petitioner.

Dr. Hinkin disagreed with Dr. Riley's testimony that her tests showed that petitioner suffered from brain damage. He criticized Riley for allowing habeas corpus counsel to be present during some of the tests, explaining that a third party's presence may alter a subject's performance on the tests. And Dr. Hinkin disagreed with Dr. Riley's method of scoring the tests given. He explained that because Blacks ordinarily perform more poorly than Whites on those tests, it is preferable to use ethnically corrected norms when scoring the tests, which Dr. Riley did not do. Once the test results were corrected for ethnicity, he said, many of Dr. Riley's tests showed that petitioner fell within the normal range, while others showed that he was in the "low average" or "mildly impaired" range and none showed that he was in the "impaired" range.

The referee found that Drs. Riley, Hinkin, and Faerstein were "all impressive, well qualified witnesses," but he was persuaded by the reasoning of prosecution

29

experts Hinkin and Faerstein. The referee expressed doubt that the three events cited by petitioner as possible causes of his alleged mental impairments (fetal abuse, head injury in a traffic accident, and physical abuse by his siblings) could have resulted in such impairments, if they in fact occurred. The referee noted that none of the six mental health professionals who had examined petitioner before trial had detected any mental defects, disorders, or significant impairments, and none had "recommended additional psychological or neuropsychological testing of petitioner." The referee therefore concluded that petitioner had presented "no credible evidence that [he] suffered from any brain damage or dysfunction at the time of petitioner's 1982 trial," and that Dr. Riley's opinion to the contrary was "not supportable."

Petitioner takes exception to the referee's finding that he had no neuropsychological impairments at the time of his capital trial. He points out that none of the four mental health professionals who had evaluated him at CYA testified at the posttrial reference hearing, nor did Drs. Imperi and Pollack, who had evaluated petitioner for the defense before trial. Instead, the prosecution relied on the testimony of Drs. Hinkin and Faerstein, neither of whom had personally examined petitioner. (See *People v. Bassett* (1968) 69 Cal.2d 122, 142-146 [rejecting testimony by prosecution psychiatrists who had not examined the defendant and who provided essentially no reasons for their conclusion that he did not suffer from diminished capacity].) Petitioner asserts that because none of the mental health professionals who examined him at CYA and before trial was a neuropsychologist, defense neuropsychologist Riley was better able than they were to determine whether he was neuropsychologically impaired.

In response, the Attorney General notes that the parties stipulated that, at the time of the posttrial reference hearing, the four mental health professionals who had evaluated petitioner at CYA had no recollection of those evaluations. The Attorney

30

General argues that even though Drs. Hinkin and Faerstein did not personally evaluate petitioner, they could reasonably rely on the information in the reports of those four mental health professionals, as well as Dr. Riley's report, in concluding that petitioner was not neuropsychologically impaired at the time of the murders, and that therefore the testimony of Drs. Hinkin and Faerstein supports the referee's finding that petitioner was not impaired. The Attorney General also argues that the reliability of defense expert Riley's evaluation was undermined by the presence of habeas corpus counsel during her evaluation of petitioner (see *In re Spencer* (1965) 63 Cal.2d 400, 411 ["Surely the presence and participation of counsel would hinder the establishment of the rapport that is so necessary in a psychiatric examination"]), and by Dr. Riley's failure to use ethnically corrected norms in evaluating the results of the neuropsychological tests she administered to petitioner (although these were not in use at the time of petitioner's trial).

We need not resolve this dispute. We did not ask the referee to decide whether petitioner was neuropsychologically impaired at the time of his capital trial, and the answer to that question does not assist us in deciding whether Defense Counsel Skyers competently assisted him at the penalty phase of trial. Rather, we asked the referee to decide what mitigating evidence Skyers *could have presented* at trial, and we asked *how credible* that evidence would have been. With respect to Dr. Riley's testimony that petitioner had neuropsychological impairments, the referee did not answer the first part of our question, but we assume for the sake of argument that Defense Counsel Skyers could have presented that evidence at trial. As to the second part of the question, the referee found that Dr. Riley's testimony was "not supportable" and implicitly found it not to be credible.

Regardless of whether, as petitioner now argues, Dr. Riley's reference hearing testimony was credible, we agree with the referee that Defense Counsel Skyers had

31

not been incompetent at trial for not discovering it. The referee found that in preparing for the trial's penalty phase, Skyers reviewed the reports of two psychologists and two psychiatrists who had evaluated petitioner at CYA, and a report prepared by two psychiatrists who had evaluated him at the request of Homer Mason, the attorney initially appointed to represent petitioner in his capital trial. None of the reports found any evidence that petitioner suffered from any psychiatric impairment. Indeed, the report prepared by Dr. Pollack (described by prosecution witness Dr. Faerstein as "one of the premier forensic psychiatrists in the United States") along with Dr. Imperi, stated that "there does not appear to be any evidence of mental illness, defect or disorder . . . ." We agree with the referee that, after reading these reports, a reasonably competent attorney could make a tactical decision not to retain a neuropsychologist to explore the possibility that petitioner had suffered from any neuropsychological impairments. Thus, regardless of the credibility of Dr. Riley's reference hearing testimony, Defense Counsel Skyers's failure to locate her (or some other neuropsychologist with similar views) did not violate petitioner's right to representation by competent counsel. (See *In re Fields* (1990) 51 Cal.3d 1063, 1075 ["When three experts concur in a diagnosis, competent counsel might reasonably believe it pointless to search further in the hope of finding an expert who would offer a different diagnosis . . . ."]; *People v. Williams* (1988) 44 Cal.3d 883, 945 ["Competent representation does not demand that counsel seek repetitive examinations of the defendant until an expert is found who will offer a supportive opinion"]; see also *People v. Payton* (1992) 3 Cal.4th 1050, 1078.)

32

b. *"Based on his misunderstanding of what constitutes mitigating evidence and the relationship of proffered evidence to petitioner's functioning and development, . . . the referee . . . erroneously excluded evidence in mitigation, deemed it irrelevant, and/or gave it little weight."*

Petitioner challenges a number of the referee's evidentiary rulings and findings, claiming they reflect an unduly narrow view of the scope of mitigating evidence.

(1) At the posttrial reference hearing, petitioner asked defense psychologist Deborah Miora about her reliance on a report prepared at CYA that said petitioner's younger half brother Gerald Trabue, Jr. (who, like petitioner, had been incarcerated at CYA) told an intake officer that Henry Robinson, who for one year was the stepfather of petitioner and Trabue, had hit Trabue with a stick, a belt, and shoes. The prosecution objected that petitioner was attempting to introduce, for its truth, circumstantial hearsay evidence that Robinson had physically abused petitioner. After a long discussion, the referee sustained the objection. According to petitioner, the referee ruled that Dr. Miora could not "base any opinions on" the report in question. Petitioner overstates the scope of the ruling. The referee simply barred Dr. Miora from describing the details of the CYA report on which she based her testimony, a ruling that was within the referee's discretion. (See *People v. Coleman* (1985) 38 Cal.3d 69, 92 [" 'While an expert may state on direct examination the matters on which he relied in forming his opinion, he may not testify as to the details of such matters if they are otherwise inadmissible.' "].)

(2) According to petitioner, the referee "limited Dr. Miora's discussion of themes such as poverty, abuse, and other negative impacts on petitioner to only those he recalled and discussed with Dr. Miora during her interviews with petitioner." But the transcript pages he cites contain no such ruling.

33

(3)  Petitioner challenges the referee's finding that the life history of petitioner's half brother, Gerald Trabue, Jr. was "immaterial to petitioner."  Petitioner argues that because Gerald, Jr. was born only 11 months after petitioner and the two of them grew up together, evidence of Gerald's childhood sheds light on petitioner's own history.  We agree with petitioner that Gerald's life history had some relevance to petitioner's childhood development, and that this one-sentence finding by the referee was erroneous.

(4)  Petitioner disputes the referee's finding that the documents in petitioner's exhibit No. 141 were irrelevant.  This exhibit consisted of news stories about conditions in South Central Los Angeles after the 1965 riots that occurred in Watts (a neighborhood in Los Angeles), a report by the American Civil Liberties Union on police misconduct during the riots, studies by university professors on demographic changes in Watts and attitudes of members of the Watts community toward the police, and a timeline of "environmental justice in Los Angeles" prepared by the Environmental Defense Fund.  According to petitioner, the documents "tended to corroborate the accounts of lay witnesses about conditions in the community and in youth facilities," and had "a tendency in reason to demonstrate the credibility" of petitioner's witnesses.  But the conditions in Watts were not at issue at the posttrial reference hearing, and petitioner does not explain how or why the reports supported the credibility of any of his witnesses.  We therefore agree with the referee's finding that the documents were irrelevant.

(5)  At the posttrial reference hearing, petitioner proffered reports asserting police brutality against Blacks during the Watts riots while petitioner (then three years old) was living there.  The referee described the authors of these reports as "very slanted or biased."  Petitioner argues that even if the authors were biased, the reports were relevant because they were circumstantial evidence tending to show that

34

members of petitioner's family held views about the police similar to those expressed in the report. Assuming for the sake of argument that this is true, those views do not mitigate the Hassan murders petitioner committed.

(6) Petitioner challenges a ruling by the referee pertaining to the testimony of his uncle, E.I. Gaithright, and his mother, Azell. When petitioner tried to question Gaithright about growing up on a Mississippi farm, picking cotton, plowing fields and milking cows, the referee sustained the prosecutor's objection, ruling that the testimony was irrelevant. Later, the referee excluded testimony by Azell about physical abuse she suffered as a child in Mississippi.

Petitioner asserts that the poverty, racism, limited schooling, and violence experienced by petitioner's mother and her siblings while growing up in Mississippi "was relevant to an understanding of the personal resources [they] brought to the difficult task of raising a large family in South Central Los Angeles, and explained why [petitioner's mother] may have been hampered in her ability to provide for and guide her children, why she may . . . [not have] accessed public resources available to assist her and her family . . . and why she might have been more hesitant to call upon police for protection from domestic and neighborhood violence." Even if that is so, the conditions in which petitioner's mother and her siblings were raised do not mitigate petitioner's criminal conduct. "[T]he background of the *defendant's family* is of no consequence in and of itself . . . because . . . the determination of punishment in a capital case turns on the defendant's personal moral culpability. It is the *'defendant's* character or record' that 'the sentencer . . . [may] not be precluded from considering' — not *his family's*." (*People v. Rowland* (1992) 4 Cal.4th 238, 279; see also *In re Scott* (2003) 29 Cal.4th 783, 821.) Evidence that petitioner's mother was a bad parent (which could evoke sympathy for petitioner) would have been admissible;

35

but evidence of childhood experiences that might have made her a bad parent (which could only evoke sympathy for petitioner's mother) was not.

(7) Petitioner challenges the referee's exclusion of proffered testimony that during the Watts riots his sister, who was then six or seven years old, heard gunshots, helicopters, and bullhorns advising residents of a dusk-to-dawn curfew, and saw National Guardsmen with rifles in the street. Petitioner asserts that the referee's exclusion of this testimony "reflects a stunningly narrow view of the scope of mitigation." We disagree. Any conceivable probative value of this testimony was so slight that the referee could properly exclude it on the ground that it would "necessitate undue consumption of time." (Evid. Code, § 352.) Petitioner also claims that the referee improperly precluded defense psychologist Miora from testifying about how the riots affected petitioner's functioning and development. We discern no such ruling on the page of the hearing transcript he cites.

(8) Petitioner asserts that the referee "improperly *rejected* a large body of mitigating life history information on the ground that the family had not offered it to trial counsel." (Italics added.) It is unclear what petitioner means by "rejected." He may be arguing that the referee excluded relevant mitigating information on the ground that members of the family did not tell trial counsel about it; or perhaps he is arguing that the referee found that relevant mitigating information admitted into evidence at the posttrial reference hearing was not credible because family members did not tell trial counsel about it. In either event, petitioner makes no citation to either the record or the referee's report to support his assertion. We therefore reject it.

(9) Petitioner questions the referee's finding that if members of his family had testified on his behalf at the penalty phase of his capital trial, the jury might not have believed them because his mother Azell, his sister Rita, and his brother Reggie had testified on petitioner's behalf at the guilt phase, and the jury implicitly rejected their

36

testimony when it convicted him of murdering Bobby and Eric Hassan. (See p. 4, *ante*.) Petitioner states that Defense Counsel Skyers could have called other family members to testify on his behalf, and that in any event the jury might have believed testimony of Azell, Rita, and Reggie about petitioner's childhood experiences even after rejecting their guilt phase testimony. But the referee found only that reasonably competent counsel might have decided for tactical reasons not to call Azell, Rita, and Reggie to testify at the penalty phase after the jury had already rejected their guilt phase testimony. Petitioner makes no showing of error in the referee's finding.

(10) In his report, the referee stated, with regard to a declaration signed by psychologist Miora: "The 154 page 'Petitioner's Life History' Core of 'Dr. Miora's' 213 page . . . declaration . . ., *created by petitioner's counsel and not the witness*, reflects a biased and highly selective 'spin' of the reference hearing evidence and exhibits." (Fn. deleted.) Petitioner asserts that this statement "erroneously and falsely accused habeas counsel of professional misconduct for aiding in the preparation of a declaration intended as a proffer of evidence." We perceive no accusation of misconduct. The referee simply noted the fact, which petitioner does not dispute, that defense expert Miora's declaration, filed by petitioner as an offer of proof describing her anticipated testimony at the posttrial reference hearing, was prepared primarily by habeas corpus counsel. The referee did not suggest that habeas corpus counsel committed misconduct by personally drafting the offer of proof instead of asking Dr. Miora to do so. Although the referee found the declaration to be a "biased and highly selective 'spin' of the reference hearing evidence and exhibits," that finding is not an accusation of misconduct; rather, it is an explanation as to why the referee found the declaration unpersuasive.

37

### C. What investigative steps, if any, would have led to the mitigating evidence described in the previous question? In 1982, when petitioner's case was tried, would a reasonably competent attorney have tried to obtain such evidence and to present it at the penalty phase?

**1. Referee's findings**

The referee found that the evidence just described could have been obtained by "retaining . . . an evidence and penalty phase investigator."

With regard to whether a reasonably competent attorney would have *tried to obtain* the evidence described above, the referee found that a reasonably competent attorney would have: (1) retained an investigator and conducted interviews to try to establish alibis for the murder of Teheran Jefferson and the Taylor crimes; (2) interviewed CYA staff about petitioner's adjustment while incarcerated there; (3) reviewed petitioner's school records; (4) reviewed the CYA medical reports; (5) interviewed all members of petitioner's immediate family to prepare a social history; (6) investigated petitioner's involvement in the Raymond Avenue Crips; (7) determined whether petitioner was drug dependent and whether that dependence had any relevance in mitigation; (8) investigated petitioner's employment history; (9) reviewed petitioner's criminal history; (10) reviewed petitioner's history as a juvenile offender; (11) consulted forensic, fingerprint, firearms, and gang experts, and consulted with doctors as to petitioner's mental status; (12) reviewed the transcripts of the preliminary hearing and trial of Evan Mallet, who was convicted as one of the perpetrators of the Taylor crimes; and (13) investigated to determine whether there was any other mitigating factor or theme.

The referee found that before petitioner's capital trial, Defense Counsel Skyers reviewed petitioner's school records and CYA medical records, as well as petitioner's

38

criminal history and history as a juvenile offender, and that Skyers did an investigation to determine whether there was some mitigating factor or theme he could present to the jury. He also interviewed some, but not all, of the members of petitioner's immediate family, and he reviewed an evaluation of petitioner's mental status that was obtained by Homer Mason, who had initially represented petitioner. Skyers did not perform the other investigative steps described above: He did not investigate the Taylor and Jefferson murders; he did not interview pertinent CYA employees; he did not interview some members of petitioner's immediate family; he did not investigate petitioner's gang involvement; he did not determine whether petitioner was drug dependent; he did not interview petitioner's employers; he did not consult forensic, fingerprint, firearms, and gang experts; and he did not review the transcripts of Mallet's preliminary hearing and trial.

With respect to what evidence a reasonably competent attorney *would have presented* at trial, the referee found:

(1) Reasonable counsel would not have presented an alibi for the murder of Teheran Jefferson, as such evidence was not presented at the posttrial reference hearing.

(2) Reasonable counsel would not have presented an alibi defense for the crimes committed in the Taylor home, because the alibi witnesses at the posttrial reference hearing were not credible, and because alibi witness Marcus Player would not have cooperated with the defense at the time of trial.

(3) Reasonable counsel would not have presented evidence of petitioner's good adjustment at CYA, because the prosecution would have been able to rebut that evidence with evidence that while petitioner was at CYA he committed "acts of misconduct," and soon after his release from CYA he murdered Bobby and Eric Hassan.

39

(4)  Reasonable counsel would not have presented evidence contained in the CYA medical reports, because those reports revealed no evidence of mental illness.

(5)  Reasonable counsel would have presented, if the evidence was disclosed to him, evidence of the love and affection that petitioner's family members had for petitioner, of the difficulties petitioner's mother encountered in raising a large family as a single mother with a limited income, of the absence of a father figure in petitioner's life when he was a child, of the impact of the death of Gerald Trabue, Sr. (who acted like a father toward petitioner until he was killed in an automobile accident when petitioner was six years old), and of the difficulties petitioner experienced in school.  Although petitioner also presented evidence at the posttrial reference hearing that his family suffered from extreme poverty, malnutrition, and inadequate clothing, the referee made no findings with regard to whether reasonable counsel would have presented such evidence, possibly because the referee found that this evidence was not credible and that petitioner's family was unwilling to disclose those matters at the time of petitioner's capital trial.

(6)  Reasonable counsel would not have presented evidence about petitioner's gang membership, as the reference hearing testimony confirmed that petitioner had been an active, hardcore gang member from the age of 12.

(7)  Reasonable counsel would not have presented evidence of petitioner's substance abuse, because such evidence was lacking, although he did smoke marijuana.

(8)  Reasonable counsel would not have presented evidence of petitioner's probation and parole history, which was unfavorable to petitioner.

(9)  Reasonable counsel would not have presented evidence of petitioner's history as a juvenile offender, because it included acts of violence and a burglary, and thus was unfavorable to petitioner.

40

The Attorney General does not dispute the referee's findings described above. Petitioner has two exceptions, which we address below.

### 2. Petitioner's exceptions to referee's findings

> a. *"The referee erroneously attributes Skyers's failure to uncover mitigating evidence to a family member conspiracy to keep information from him."*

The referee found that "nondisclosure of family history by petitioner or members of his immediate family was purposeful and that no attorney or investigator could have developed the family mitigation . . . presented [at the posttrial reference hearing] in view of the failure to disclose." The referee later observed: "[E]ven if petitioner's present claims of mitigating evidence available to present at petitioner's trial in 1982 are credible, the failure of petitioner's trial counsel to uncover and present such mitigating evidence is not the product of any deficient performance by trial counsel; rather, it is the product of the Champion family not disclosing family business to petitioner's trial counsel, Ronald Skyers."

Petitioner asserts that the referee found a "conspiracy" by members of his family to withhold information from Defense Counsel Skyers. He argues that it was his counsel's obligation to seek out relevant information about petitioner's upbringing, and that the blame for failing to discover it should be attributed not to petitioner's family but to his counsel.

We agree with petitioner that to conduct a reasonably competent investigation, defense counsel in a capital case must often explain to family members that "negative" information about the defendant's childhood is often a crucial part of the defense's penalty presentation in a capital case, and therefore the family should not withhold such information. Here, Defense Counsel Skyers's reference hearing testimony contains no indication that he explained this to petitioner's family. (See *In*

41

*re Lucas* (2004) 33 Cal.4th 682, 729-730 [the petitioner's failure to reveal that he had been abused as a child did not excuse trial counsel's "perfunctory investigation" because the petitioner would not have understood the significance of such information and counsel "did not press [the] petitioner to reveal information concerning such matters"].)  Had Skyers done so, it is unlikely that petitioner's family would have withheld such information, in view of the referee's finding that they loved petitioner and the evidence that they pooled their resources, using money they could ill afford to spend, to hire Skyers to represent petitioner.

That said, petitioner's assertion that the referee found a family "conspiracy" to withhold evidence overstates the referee's findings.  The referee found no conspiracy; rather, he correctly observed that at the time of petitioner's capital trial the members of his family chose not to mention negative aspects of petitioner's upbringing to Defense Counsel Skyers.  This circumstance necessarily made it more difficult for Defense Counsel Skyers to discover such information for use at the trial's penalty phase.

> b.  *"The referee erred in failing to fully credit the* Strickland *expert's opinions."*

At the posttrial reference hearing, petitioner called Jack Earley, an experienced criminal defense attorney, who testified that in 1982, when petitioner was tried for the Hassan murders, a reasonably competent attorney would have conducted a far more thorough *investigation* than that done by Defense Counsel Skyers.  The Attorney General's cross-examination, which took up more than 800 pages of transcript, focused on a different question:  whether a reasonably competent attorney would have *presented*, at trial, the evidence that was gathered by petitioner's habeas corpus counsel and introduced at the posttrial reference hearing.

The referee generally agreed with Attorney Earley that Defense Counsel Skyers's penalty phase investigation fell below the standard of a reasonably competent attorney in 1982. But the referee concluded that a reasonably competent attorney would not have presented, at the penalty phase of petitioner's trial, the bulk of the evidence petitioner produced at the posttrial reference hearing. Petitioner takes exception to the referee's finding, challenging both its form and its substance.

As to its form, the referee's report has a long and detailed critique of Earley's testimony. As petitioner points out, this critique was copied almost verbatim from proposed findings of fact prepared by the Attorney General. Petitioner cites some decisions in civil cases that have criticized trial courts for using findings of fact prepared by a party (see, e.g., *Anderson v. Bessemer City* (1985) 470 U.S. 564, 572 ["We . . . have criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties . . . ."]) and petitioner argues that this criticism should also apply to referees in habeas corpus reference hearings. He also relies on a decision of the Indiana Supreme Court in a criminal case, which states: "[W]e do not prohibit the practice of adopting a party's proposed findings. But when this occurs, there is an inevitable erosion of the confidence of an appellate court that the findings reflect the considered judgment of the trial court." (*Prowell v. State* (Ind. 2001) 741 N.E.2d 704, 709.)

Petitioner's argument here is, in essence, the reverse of the argument he made in a previously discussed exception. There, he defended a declaration signed by one of his expert witnesses (psychologist Miora) but authored in part by his habeas corpus counsel. (See pt. II.B.3.b., *ante.*) Here, he criticizes the referee for signing a report that was authored in part by the Attorney General.

In our view, a referee's report, like an expert witness's declaration, may properly contain materials drafted by counsel. But because lawyers are advocates and

not arbiters, their work may lack the impartiality of a report done personally by the referee. Here, the referee's report describes psychologist Miora's declaration (drafted by petitioner's habeas corpus counsel) as "a biased and highly selective 'spin' of the reference hearing evidence and exhibits." We do not quarrel with that description; an objective reader might come to a similar conclusion with respect to that portion of the referee's report that discussed Attorney Earley's reference hearing testimony and was drafted by the Attorney General.

In any event, the referee's critique of Attorney Earley's testimony about which petitioner complains pertains almost entirely to the testimony Earley gave on cross-examination by the Attorney General, as to whether a reasonably competent attorney would have presented, at the penalty phase of petitioner's capital trial, the evidence that habeas corpus counsel presented at the posttrial reference hearing. This portion of Earley's testimony was of relatively little value, for two reasons. First, Earley was not present during and did not read the testimony of the witnesses at the reference hearing, nor did he read all of the transcripts of the trials of petitioner and Evan Mallet, thereby limiting his ability to determine what evidence a reasonably competent attorney would have presented at trial. Second, although Earley gave helpful testimony on the type of *investigation* that was customarily conducted more than 30 years ago, when petitioner's trial occurred, the question of which evidence a reasonably competent trial counsel should have *presented* is primarily a question of law for this court to decide.

With regard to the substance of the referee's finding in question, petitioner defends Attorney Earley's reference hearing testimony on direct examination describing the type of investigation that, in Earley's view, a reasonably competent trial attorney would have undertaken. It is unclear why petitioner sees a need to defend this portion of Earley's testimony, because the referee generally agreed with it.

44

The referee found that some of Attorney Earley's opinions at the posttrial reference hearing were "flawed because he employed a standard of whether he would or would not have taken certain action, rather than the appropriate and applicable standard of whether reasonably competent trial counsel would or would not have taken the action." Petitioner takes exception, asserting that Earley's testimony reflected the correct legal standard. Because the referee did not specify the portions of Earley's extensive reference hearing testimony that the referee viewed as relying on an inappropriate standard, we cannot assess the accuracy of the referee's finding, and we see no need to do so because the referee's vague finding on this point does not affect our resolution of petitioner's claim of incompetent representation at trial by Defense Counsel Skyers.

### D. What circumstances, if any, weighed against the investigation or presentation of the mitigating evidence not presented by counsel at trial? What evidence damaging to petitioner, but not presented by the prosecution at the guilt or penalty trials, would likely have been presented in rebuttal if petitioner had introduced this evidence?

#### 1. Referee's findings

The referee found that these circumstances weighed against *investigation* by trial counsel of the additional evidence proposed by petitioner: (1) Petitioner's family members did not disclose adverse family history to Defense Counsel Skyers; (2) alibi witness Marcus Player was not available to Defense Counsel Skyers; (3) it is unknown whether Evan Mallet, who was convicted at a separate trial of the Taylor crimes, was available or willing to testify on petitioner's behalf; (4) it is unknown whether Lewis Champion III, one of petitioner's brothers, was available or willing to testify on petitioner's behalf; (5) the psychiatric evidence available to Defense Counsel Skyers suggested that there was no need for him to hire an expert to conduct

45

a neuropsychological examination; (6) it is "highly unlikely" that alibi witnesses who were members of the Raymond Avenue Crips (Marcus Player, Wayne Harris, and Earl Bogans) were available or willing to testify; and (7) there is "insufficient evidence from which to conclude that . . . Robert Simms' fingerprints were available."

The referee found that these circumstances weighed against the *presentation* at trial of the additional evidence proposed by petitioner at the posttrial reference hearing:  (1)  "[K]ey family members" lacked credibility because the jury had rejected their guilt phase testimony, and the prosecution had access to records from CYA and petitioner's school that contained statements from petitioner and his mother contradicting certain testimony offered by members of petitioner's family at the reference hearing.  (2)  The defense lacked documentary support for claims that petitioner had brain damage resulting from fetal abuse, traffic accident head trauma, or head injuries resulting from beatings by other family members.  (3)  As to testimony by members of petitioner's family that as a child he suffered from extreme poverty and malnutrition and lacked clothing (testimony that the referee found not to be credible), the defense at trial would have needed to "modify" that testimony to testimony that was "consistent with the . . . evidence" — that petitioner's mother was a single parent who struggled, financially and emotionally, to provide support and care to a large family.  (4)  Psychiatric and psychological reports from CYA contradicted petitioner's evidence that he suffered from mental defects or disorders. (5)  No family members, relatives, friends, or neighbors, of petitioner were willing to say that he suffered from any type of mental impairment.  (6)  The prosecution at trial could have presented additional evidence of petitioner's gang membership and violent history. (7)  The prosecution could have countered some of the mitigating evidence with petitioner's prior statements to CYA authorities and law enforcement.

46

With regard to rebuttal evidence that the prosecution would likely have presented if the defense, at petitioner's capital trial, had introduced the mitigating evidence presented at the posttrial reference hearing, the referee made these findings:

(1)  If the defense at trial had presented alibi evidence pertaining to the Taylor crimes, the prosecution could have elicited testimony from two of petitioner's alibi witnesses — Wayne Harris and Earl Bogans — that they, petitioner, and the third alibi witness (Marcus Player) were all members of the Raymond Avenue Crips, and that testimony would have contradicted petitioner's guilt phase testimony at trial that he and the others were not gang members.  The prosecution could have shown that at the time of petitioner's trial, alibi witness Marcus Player was awaiting trial on a murder charge.  The prosecution could have elicited testimony from alibi witness Harris that Harris went to petitioner's home, where he saw codefendant Ross, after being questioned by sheriff's deputies on the night of the Taylor crimes.  If psychologist Miora had testified at trial as a defense expert, the prosecution on cross-examination could have elicited from her the information that Ross was one of petitioner's best friends.  (Evidence linking petitioner to Ross would have supported the prosecution's argument that petitioner was one of the perpetrators of the Taylor crimes, because there was overwhelming evidence that Ross was one of the perpetrators.)

(2)  If the defense at trial had presented evidence that petitioner grew up in poverty, that he suffered malnutrition, that he was physically abused by his siblings, that he was a follower, and that he had neuropsychological deficits, the prosecution could have rebutted this evidence with testimony from petitioner's alibi witnesses (Harris, Bogans, and Player), all of whom testified at the posttrial reference hearing that petitioner was not a follower, that he did not live in poverty, that he did not appear malnourished, that he never complained of physical abuse by his siblings, and

47

that he showed no signs of mental problems. Similarly, if the defense had called Gary Jones, who testified about his childhood friendship with petitioner, the prosecution could have elicited testimony from Jones that petitioner did not suffer from poverty, malnutrition, and physical abuse as a child.

(3) The prosecution at trial could have used, to rebut testimony that petitioner suffered brain damage in utero, the statements of petitioner's mother to school authorities that she had a normal childbirth. The prosecution could have used the statements of petitioner's mother to CYA authorities that all was well at petitioner's home, as well as petitioner's statements to CYA authorities that he had a "regular family," to rebut testimony that petitioner was abused by his siblings. The prosecution could have used petitioner's statements to CYA authorities that he was not a follower or easily influenced by others to rebut evidence that he did not play a leading role in the murders.

(4) A "mitigation expert . . . [testifying about] positive CYA adjustment, child development/functioning, increasing community dangers, lack of gang involvement and lack of association with Raymond Avenue [Crips] gang members, might be questioned about petitioner's violent history, gang membership or petitioner's prior statements."

(5) Petitioner "had an extensive, violent criminal arrest record" which "might [have] become admissible to impeach a witness or impeach the basis of petitioner['s] mitigation expert's opinion." The prosecution at trial could also have presented additional details of the two robberies petitioner committed as a juvenile, facts that were not all presented to the jury.

(6) The prosecution could have responded to defense efforts to minimize the extent of petitioner's participation in the Raymond Avenue Crips with "evidence showing the degree and extent of petitioner's involvement in gangs."

48

(7) If the defense had presented evidence that petitioner lived in an increasingly dangerous neighborhood as a teenager, the prosecution could have responded with evidence that petitioner was a gang member from the age of 12 and that his gang, the Raymond Avenue Crips, committed most of the violent crimes that made the neighborhood dangerous.

(8) The prosecution at trial could have used petitioner's arrest records to show petitioner's "extended association" with Evan Mallet, Michael Player, and Craig Ross, all of whom participated in the Taylor crimes.

(9) If the defense at trial had presented evidence that petitioner was amenable to rehabilitation in a structured setting, the prosecution could have introduced petitioner's statements to a CYA psychologist that he was not easily influenced by others and that he committed crimes for "fast money" and because he "could get away with things," and the prosecution could have pointed out that petitioner participated in the murders of Bobby and Eric Hassan less than two months after his release from CYA. The prosecution could also have presented evidence that, while at CYA, petitioner led a race-based riot and assaulted another inmate.

**2. Attorney General's exceptions to referee's findings**

*a. Petitioner's difficulties in school*

The referee found: "The only areas . . . that should have been presented if disclosed are: . . . family members' love and affection [for] petitioner; his traits of being loving toward them and his protective nature; Mrs. Champion's difficulties in being a single parent and raising a large family with very limited income; the absence of a father figure . . .; the impact that Trabue Sr.'s death had on the family; and petitioner's school difficulties." According to the referee, the "nondisclosure of relevant family history" by petitioner's family "precluded attorney Skyers from considering these mitigation themes." The referee also found, however, that Skyers

49

should have independently reviewed petitioner's school records and interviewed his teachers.

The Attorney General takes exception to these findings to the extent they "might be interpreted as a finding that Skyers was deficient for not presenting [evidence that petitioner had] 'school difficulties' at the penalty phase." The Attorney General points out that the referee found that "when petitioner put his mind to his education, he could be successful," but "when he preferred to participate with his gang beginning at age 12 or 13 . . . his school work suffered." She also notes that the referee found that the prosecution could have "neutralized" evidence of petitioner's difficulties in school with evidence of petitioner's gang involvement and school records indicating that petitioner "could do well when he applied himself." Thus, the Attorney General argues, had Defense Counsel Skyers presented evidence of petitioner's "school difficulties" at the penalty phase of trial, the prosecution would have been able to counter that evidence with evidence that those difficulties resulted from choices petitioner made, not from limitations on his ability, and Defense Counsel Skyers made a reasonable tactical decision not to present evidence of petitioner's "school difficulties."

The Attorney General's argument is unpersuasive. As the referee explained, Defense Counsel Skyers could have presented psychiatric evidence that petitioner suffered from "a low IQ, low intellectual functioning, reading and learning difficulties, attention deficits . . . , deficiency in ability to conceptualize, [and] low self esteem." A jury could reasonably have concluded that petitioner's poor performance in school was attributable at least in part to those deficits. Petitioner's membership in the Raymond Avenue Crips (of which the jury was already aware) and comments in petitioner's school records that he could do well when he applied himself are not

50

persuasive reasons for defense counsel's failure to present such evidence at the penalty phase of the trial.

The Attorney General argues that if petitioner had presented evidence at the penalty phase of trial that his school difficulties resulted from extreme poverty or from brain damage caused by fetal abuse, sibling abuse, or head injury, the prosecution could have responded with "devastating rebuttal" by showing that petitioner's family was not impoverished and that there was no credible evidence that petitioner ever suffered an injury likely to lead to brain damage. But the referee did not find that Defense Counsel Skyers should have presented such evidence; rather, as explained above, he found that Skyers should have presented evidence that petitioner's school difficulties resulted from "a low IQ, low intellectual functioning, reading and learning difficulties, attention deficits . . . , deficiency in ability to conceptualize, [and] low self esteem." The Attorney General does not mention any "devastating rebuttal" that the prosecution could have presented to counter such evidence.

According to the Attorney General, to the extent evidence about petitioner's school difficulties required disclosures from petitioner and his family, a reasonably competent attorney could not be expected to discover that evidence. But we see no reason why Defense Counsel Skyers would have required the cooperation of petitioner's family to obtain such evidence. Moreover, the reluctance of petitioner's family to disclose to Skyers the negative aspects of his family background may have stemmed from a desire not to say anything that might harm petitioner, who, the referee found, was loved by his family. If defense counsel had explained to the family that these negative aspects could be beneficial to petitioner, it is likely that his family would have been willing to discuss them.

51

### b. Testimony of petitioner's mother and sister

The referee found that "the *best practice* for trial counsel would have been to" call the members of petitioner's family at the penalty phase to testify to their love for petitioner, and that Gary Jones's "recollection as to his childhood experience with petitioner should have been presented." According to the referee, "some of the best moments for petitioner at the reference hearing" occurred when petitioner's mother "described her feelings about her son" and when petitioner's childhood friend Jones "described his feelings about petitioner."

The Attorney General points out that a reviewing court may not resolve a claim that a defendant's trial counsel was ineffective by determining what would have been the "best practice," because, as the high court has said, "[t]here are countless ways to provide effective assistance in any given case" (*Strickland v. Washington* (1984) 466 U.S. 668, 689) and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" (*ibid.*). The Attorney General notes that a reviewing court must decide whether the attorney's representation "fell below an objective standard of reasonableness under prevailing professional norms" (*People v. Mai* (2013) 57 Cal.4th 986, 1009), not whether the attorney engaged, in the referee's words, in the "best practice." But we construe the referee's finding in question as simply telling this court which portions of the evidence presented at the posttrial reference hearing would, in his view, have been useful for presentation by the defense at trial. We accept the referee's finding for this limited purpose.

**3. Petitioner's exception to referee's findings: "No evidence <u>damaging to petitioner</u>, but <u>not presented by the prosecution at the guilt or penalty trials</u>, would <u>likely</u> have been presented in rebuttal if petitioner had introduced at trial the mitigating evidence adduced at the reference hearings; nor were there other circumstances which would have led reasonable counsel to not present this mitigating evidence."**

Petitioner asserts that, contrary to the referee's findings described above (see pt. II.D.1., *ante*), the prosecution at trial would not have introduced *any* evidence damaging to him if he had introduced at trial the mitigating evidence he presented at the posttrial reference hearing, and there were no other circumstances that would have caused a reasonable counsel not to present that evidence. As explained below, we disagree.

Petitioner argues that the prosecution at trial would not have presented any evidence in rebuttal if trial counsel had presented an alibi defense to the Taylor crimes. Petitioner accepts the referee's finding that petitioner's three crucial alibi witnesses (Marcus Player, Earl Bogans, and Wayne Harris) were problematic for the defense because they, like petitioner, were members of the Raymond Avenue Crips street gang, and because their testimony contradicted that of petitioner's. Petitioner insists, however, that an alibi defense could have been presented based on his own testimony and the "corroborating reference hearing testimony of law enforcement officers." Not so. The officers did not corroborate petitioner's testimony that he was at home at the time of the Taylor crimes, and they did not corroborate his testimony that he was not in the brown Buick car. Such corroboration could only have come from witnesses Player, Bogans, and Harris, all of whom, the referee found, lacked credibility. (See pt. II.B.1, *ante*.)

Petitioner argues that even if the referee is correct that if the defense at trial had called alibi witnesses Player, Bogans, and Harris to testify, the prosecution could have used these defense witnesses to corroborate its claim that petitioner was a member of the Raymond Avenue Crips street gang, the harm to petitioner that would

53

have resulted from the prosecutor's use of the witnesses in this fashion was minor compared to the risk that the jury would find that petitioner was one of the perpetrators of the Taylor crimes. If Player, Bogans, and Harris could have given persuasive testimony that petitioner was innocent of the Taylor crimes, we agree with petitioner that the defense should have presented that testimony, even if the jury would have also heard additional evidence that petitioner was a member of the Raymond Avenue Crips street gang. But, as the referee found, the testimony of petitioner's alibi witnesses was not credible.

According to petitioner, the referee made a finding that if petitioner had at trial presented an alibi defense pertaining to the Taylor crimes, the prosecutor might have called Evan Mallet, who had been convicted of committing those crimes, to testify in rebuttal. Petitioner disagrees with this alleged finding, asserting that "no reasonable prosecutor would have called Mallet." We agree with petitioner that it is highly unlikely that the prosecution would have called Mallet to testify, but we discern no contrary finding by the referee: No mention of Mallet appears in the referee's summary of the rebuttal evidence that the prosecution could have presented at trial, and the pages of the referee's report from which petitioner perceives such a finding merely describe Attorney Earley's posttrial reference hearing testimony when he was cross-examined about the possibility that the prosecution might have called Mallet to testify at trial.

The referee found that if at trial the defense had presented evidence of petitioner's potential for institutional adjustment if sentenced to life imprisonment without possibility of parole, the prosecution could have countered with evidence that, while at CYA, petitioner led a race-based riot and assaulted another inmate. Petitioner asserts that the CYA misconduct was insignificant because it occurred early in his confinement at CYA, and that his behavior at CYA improved over time.

54

According to petitioner, even if the prosecutor had introduced evidence that petitioner "was not 100% successful at CYA," the defense could have countered that testimony with expert witnesses of its own. But petitioner's argument does not show that the referee was wrong in finding that if at trial the defense had introduced evidence that petitioner would adjust well to incarceration, the prosecution could have countered this with evidence of petitioner's misconduct at CYA.

With regard to petitioner's upbringing and social history, petitioner disagrees with the referee's finding that if he had presented evidence at trial that as a child he suffered from poverty, malnutrition, and physical abuse by his siblings, the prosecution could have rebutted this evidence with testimony to the contrary from petitioner's alibi witnesses (Harris, Bogans, and Player) and petitioner's childhood friend (Gary Jones). Petitioner asserts that "it is highly unlikely that the prosecutor would have called [these witnesses] to testify as to petitioner's upbringing." We agree with petitioner that the prosecutor at trial would not have initiated calling those witnesses himself. But that is not what the referee found. Rather, the referee explained that had the defense called these witnesses to testify at trial, the prosecutor might have questioned them on cross-examination about the circumstances of petitioner's upbringing, much as the Attorney General did at the posttrial reference hearing. We perceive no error in the referee's finding.

Petitioner challenges as "ludicrous" the referee's finding that at trial the prosecution could have presented a statement of petitioner's mother to school authorities that petitioner's birth was normal (if the defense had claimed that petitioner suffered brain damage from fetal abuse), and her statement to CYA authorities that all was well at home as well as petitioner's statement to CYA authorities that he had no major problems at home (if the defense had claimed that petitioner was abused by his siblings). We agree with the referee that at trial the

55

prosecution could have used these statements by petitioner and his mother to refute a defense penalty phase claim that petitioner suffered fetal brain damage or that he was physically abused at home.

### E. Did petitioner do or say anything to hinder or prevent the investigation or presentation of mitigating evidence at the penalty phase, or did he ask that any such evidence not be presented? If so, what did he do or say?

The referee found that petitioner did nothing to hinder or prevent the investigation of mitigating evidence at the penalty phase of trial, and that he did not ask that any such evidence not be presented. Neither party takes exception to these findings.

## III. Discussion

Because a habeas corpus petition is a collateral attack on a presumptively valid judgment, " 'the petitioner bears a heavy burden initially to *plead* sufficient grounds for relief, and then later to *prove* them.' " (*In re Price*, *supra*, 51 Cal.4th 547, 559.) Even when, as here, this court finds that a habeas corpus petition states a prima facie showing that the petitioner is entitled to relief, the petitioner must still " 'prove, by a preponderance of the evidence, facts that establish a basis for relief on habeas corpus.' " (*In re Cudjo* (1999) 20 Cal.4th 673, 687; see also *In re Bacigalupo* (2012) 55 Cal.4th 312, 333.) "Because the referee observes the demeanor of the witnesses as they testify, we generally defer to the referee's factual findings and 'give great weight' to them when supported by substantial evidence." (*Bacigalupo*, *supra*, at p. 333.)

Petitioner here claims that defense counsel's performance at the penalty phase of trial violated petitioner's right, under both the federal Constitution's Sixth Amendment and the California Constitution's article I, section 15, to the effective

assistance of counsel.  To obtain relief, he "must prove ' "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that counsel's deficient performance was prejudicial, i.e., that a reasonable probability exists that, but for counsel's failings, the result would have been more favorable to the defendant." ' " (*In re Crew* (2011) 52 Cal.4th 126, 150.) A reasonable probability, the high court has said, "is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington*, *supra*, 466 U.S. 668, 694.)

As we have already explained, we agree with the referee that Defense Counsel Skyers was not incompetent at trial for not retaining a neuropsychologist to investigate the possibility that petitioner had neuropsychological deficits (see pt. II.B.3.a., *ante*), that petitioner has not shown that Skyers could have discovered that Robert Simms's fingerprints were found at the Taylor home (see pt. II.B.2.c., *ante*), and that alibi witness Marcus Player (who was facing a murder charge at the time of petitioner's trial) would not have talked to a defense investigator and thus could not have been used by the defense at trial (see pt. II.B.2.b., *ante*).  We must now decide whether, based on the remaining evidence that petitioner presented at the posttrial reference hearing, petitioner is entitled to relief.

Pertinent here is this observation by the United States Supreme Court:  "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland v. Washington*, *supra*, 466 U.S. 668, 697.)  Here, as in the case of the attorney who represented petitioner's codefendant, Craig Anthony Ross (see *In re Ross* (1995) 10 Cal.4th 184, 204 (*Ross*)), we need not decide whether Defense

57

Counsel Skyers competently represented petitioner at trial, because any inadequacy did not prejudice petitioner. Our reasons follow.

We first consider the evidence that, according to petitioner, Defense Counsel Skyers should have discovered and presented in response to the aggravating evidence presented by the prosecution. Significantly, none of this evidence pertained to the circumstances of the murders of Bobby and Eric Hassan of which petitioner was convicted. Those murders were egregious: The victims, one of them a 14-year-old handicapped boy, were each shot in the head, execution-style, while lying on a bed. Nor did petitioner present any mitigating evidence pertaining to the robbery and the aggravated assault that he committed as a juvenile, as to which the prosecution presented aggravating evidence at the penalty phase of petitioner's trial. In the latter offense, petitioner personally displayed callousness and brutality, kicking the victim and cutting him with a knife.

As to the Taylor crimes, petitioner could have presented an alibi defense at trial. But the referee found the testimony by petitioner's alibi witnesses not credible, a finding with which we agree. Furthermore, had their testimony been presented at trial, it would have contradicted the guilt phase testimony of petitioner and his mother that petitioner was at home when the Taylor crimes were committed, and it would have contradicted petitioner's trial testimony that he was not a member of the Raymond Avenue Crips. Thus, there is not a reasonable probability that the outcome of the penalty phase of petitioner's capital trial would have been different had defense counsel presented that evidence.

We now consider the evidence pertaining to petitioner's social history, development, and functioning. We begin by summarizing the evidence presented at the posttrial reference hearing.

58

Through testimony by petitioner's mother and uncle, by three of petitioner's sisters, by his childhood friend Gary Jones, and by psychologist Deborah Miora, petitioner presented this evidence at the reference hearing:

Petitioner was born on August 26, 1962. His father, Lewis Champion II, verbally and physically abused petitioner's mother, Azell Champion. When Azell became pregnant with petitioner, Lewis II said he did not want any more children, and he repeatedly hit and kicked Azell to try to kill the fetus.

Shortly before petitioner's birth, his parents separated, and within a few months Azell became involved with Gerald Trabue, Sr.; the couple later had two children. Trabue, who owned an electronics business, was a good provider and was kind to Azell's children. But when petitioner was six years old, the family car was hit by a driver who ran a red light. Everyone in the family car was hurt; Trabue's injuries were so serious that he died two weeks later. Petitioner broke his collarbone and suffered a head injury. His mother became depressed after Trabue's death.

Within a year after Trabue's death, Azell married Henry Robinson, with whom she had another child, but the marriage lasted less than a year. Thereafter, petitioner had no adult male figure in the home.

After Trabue's death, Azell worked outside the home to support her family, and she was unable to look after the children during the day.[4] Petitioner's sister Linda and his brother, Lewis III (six years older than petitioner), cared for the younger children. Lewis III hit the other children with belts and an extension cord, resulting in calls to the police. When Lewis III was 16 years old, he entered the Job Corps for

---

[4]    The two children of Azell and Trabue received money from the settlement of a wrongful death action filed on their behalf after Trabue's death. Azell received no money in the action, apparently because she and Trabue were unmarried. She did, however, receive an unspecified amount of money as benefits from a policy insuring Trabue's life.

four to seven months. After he returned, he began using phencyclidine (PCP), and the frequency and severity of his physical abuse of the younger children, including petitioner, increased. He destroyed family pictures and furniture, put holes in the wall, and knocked out windows. On several occasions, the police took him to the state mental hospital in Norwalk for observation, after which he was released.

Petitioner's second oldest brother, Reginald, was a disturbed child who, after he grew up, was diagnosed with schizophrenia and bipolar mood disorder, and ended up in prison for shooting his brother-in-law. He also assaulted petitioner when they were children.

Petitioner grew up in South Central Los Angeles. He was teased because his skin was very dark and his clothes were old, and he had low self-esteem. He performed poorly in elementary school, and his school reports mention that he was distracted by problems at home.

At the age of 15 years, after participating in the robbery of three persons at a Greyhound Bus depot, petitioner was committed to a camp. The next year, after petitioner assaulted Jose Bustos with a knife (see pp. 4-5, *ante*), the juvenile court committed him to CYA. The Hassan murders occurred two months after his release on parole.

Petitioner contends that if defense counsel at trial had presented the evidence described above, there is a reasonable probability that the jury would not have imposed a death sentence at the penalty phase of petitioner's capital trial. We disagree. The referee found that the testimony at the posttrial reference hearing that petitioner grew up in extreme poverty was not credible (see pt. II.B.1, *ante*), and he found that the reference hearing testimony that petitioner was beaten by his older brothers was "not true," although he found that petitioner's brother Lewis's attempts to discipline petitioner may at times have been "inappropriate." And if the defense at

60

trial had called petitioner's reference hearing witnesses Harris and Bogans to give alibi testimony for the Taylor crimes, or if it had called petitioner's friend Gary Jones to testify about petitioner's good character as a child, the prosecution at trial could have used these witnesses to rebut the evidence of poverty and abuse.

Petitioner argues that the jury at his capital trial might have credited the posttrial reference hearing testimony by members of his family that he was physically abused by his oldest brother Lewis, if defense counsel had presented such testimony at the penalty phase of his trial. Pertinent here is this court's decision in *Ross*, *supra*, 10 Cal.4th 184. In *Ross*, petitioner's codefendant, Craig Ross, claimed his attorney was incompetent for not presenting mitigating evidence at the penalty phase. At Ross's posttrial habeas corpus reference hearing, he presented evidence of physical abuse as a child by his stepfather, and he argued that his trial attorney should have presented this evidence at the penalty phase of trial. This court found that if Ross's trial attorney had done so, the prosecution could have rebutted it with "a psychiatric report prepared when [Ross] was 15 years old," stating that Ross had told the psychiatrist that "he liked and got along well with" his stepfather, who had not abused him. (*Id.* at p. 206.) Similarly, if petitioner's mother had testified at the penalty phase that petitioner had been physically abused by his brothers as a child, the prosecution could have responded with evidence that (1) petitioner's mother had told a CYA parole officer that her children "all relate[d] well to each other, respect[ed] the parent, and [were] helpful at home" and that the family was "normal in all respects"; and that (2) petitioner had told a CYA psychiatrist he had a "regular family" with "the usual sibling rivalry" and his family relationships were not a "major problem."

Petitioner asserts that reasonable jurors could well have concluded that his "development and functioning [were] adversely affected by living in a community plagued by violence." He notes that he "was *not* raised in a reasonably safe, relatively

61

affluent community with good schools, by people with the advantages of education, steady employment, sound mental health, and access to resources . . . ." He contends that "[a] reasonable juror could decide that children being beaten by persons from rival neighborhoods, gunfire in the streets, and the perception . . . that the police were not on one's side represents a very substantial set of obstacles to healthy development." But this can also be said of codefendant Ross, who grew up in the same neighborhood and who, at his own reference hearing, presented testimony that he "lived in a violent neighborhood [and] that his failure to be rehabilitated was partly the fault of institutional authorities." (*Ross*, *supra*, 10 Cal.4th at p. 205.) This court held that Ross was not prejudiced by his attorney's failure to present this evidence at trial. (*Id.* at p. 213.)

The remaining evidence presented by petitioner at the posttrial reference hearing paints the picture of a childhood that was marred by tragedy (the death of Gerald Trabue, Sr., petitioner's stepfather), after which petitioner's mother struggled financially. And petitioner struggled with the challenges of a below-average intelligence, reading and learning difficulties, and attention deficits. None of the evidence, however, was so weighty that it was likely to affect the trial jury's determination that the brutal Hassan murders committed by petitioner and his confederates, when combined with petitioner's prior history of robbery and aggravated assault, warranted the death penalty.

In *Ross*, this court held that defense counsel's failure at trial to present, at the penalty phase of trial, certain evidence comparable to the evidence in question here on behalf of Ross (petitioner's codefendant) did not prejudice Ross. The decision noted that Ross participated in "the cold-blooded killing of a father and fourteen-year-old son, who were shot while lying on a bed, one with his hands tied behind his back." (*Ross*, *supra*, 10 Cal.4th at p. 213.) The killings were "gang-conducted robbery

62

murders, not sudden explosions of angry violence or psychopathic serial killings."
(*Ibid*.) The same can be said of petitioner here. And, as this court observed in *Ross*:
"Although the additional mitigating evidence, had it been presented, might have
evoked sympathy, there was no compelling connection between that evidence and the
crimes of this case." (*Ibid*.)

## Conclusion and Disposition

Because our order to show cause and reference order were limited to the claim
of ineffective assistance of counsel at the penalty phase of petitioner's capital trial, we
do not address any other claim raised in the petition for writ of habeas corpus. The
remaining claims will be resolved by a separately filed order. (See *In re Boyette*
(2013) 56 Cal.4th 866, 898.)

The order to show cause is discharged.

KENNARD, J.*

WE CONCUR:

CANTIL-SAKAUYE, C. J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

---

* Retired Associate Justice of the Supreme Court, assigned by the Chief Justice
pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re Champion
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding** XXX
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S065575
**Date Filed:** April 14, 2014
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Francisco P. Briseno, Referee


_____

**Counsel:**

Karen Kelly, under appointment by the Supreme Court, for Petitioner Steve Allen Champion.

Bill Lockyer, Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Pamela C. Hamanaka, Assistant Attorney General, Sharlene A. Honnaka, Robert S. Henry and Steven E. Mercer, Deputy Attorneys General, for Respondent State of California.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Karen Kelly
P.O. Box 6308
Modesto, CA  95357
(209) 552-0988

Steven E. Mercer
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 576-1344