Filed 3/18/15  P. v. Nunez CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANTONIO NUÑEZ,<br><br>    Defendant and Appellant. | B250820<br><br>(Los Angeles County<br>Super. Ct. No. KA099489) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mike Camacho, Judge.  Affirmed.

Danalynn Pritz, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Chung L. Mar and Idan Ivri, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Antonio Nuñez appeals from the judgment entered following his conviction by a jury for multiple sexual offenses.  Nuñez contends the court improperly admitted hearsay statements by one of the victims that corroborated her trial testimony and committed sentencing errors.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

1.  *The Information*

Nuñez was charged by amended information with one count of forcible rape (Pen. Code, § 261, subd. (a)(2)) (count 1),[1] one count of sexual penetration of an intoxicated person (§ 289, subd. (e)) (count 4) and three counts of rape of an intoxicated person (§ 261, subd. (a)(3)) (counts 3, 5 and 6) with respect to Taylor Doe and two counts of rape of an intoxicated person with respect to Paulina Doe (counts 2 and 7).[2]  Nuñez pleaded not guilty.

2.  *Summary of the Evidence Presented at Trial*

    a.  *The People's case*

        i.  *Taylor's testimony*

Taylor, 16 years old when the offenses were committed, testified she and her then 21-year-old cousin, Paulina, had planned to meet Paulina's brother, Josh G., and his friend Chris at an all-ages club in Pomona on March 30, 2012.  On the way to Pomona they stopped at a liquor store where Paulina purchased a bottle of vodka, approximately 15 inches tall, and some juice.  Shortly before 10:00 p.m. they parked in a lot across the street from the club and began drinking shots of vodka followed by juice "to get a cool little buzz."  The girls drank for approximately 40 minutes, consuming about three-fourths of the bottle.  After they got out of the car, they were approached by several people who were proselytizing for their church.  As Taylor and Paulina were talking to

---

1    Statutory references are to the Penal Code unless otherwise indicated.

2    Because Taylor was a minor at the time the offenses were committed, she and Paulina were identified with the fictitious last name "Doe."  We refer to them by their first names for convenience and clarity as we also do for witnesses who share the same surname.

2

them, Taylor began feeling drunk and observed Paulina was unable to stand up straight. After 20 to 30 minutes Taylor and Paulina began walking toward the club, but Paulina was having difficulty with her balance. The girls put their arms around each other to help Paulina walk. When they got to the club's entrance, the bouncers would not let them in because Paulina was too intoxicated. Using her cell phone, Taylor called Chris, who was already in the club, to tell him they could not get in.

As Taylor and Paulina walked back to the car, Paulina continued to stumble while Taylor tried to assist her. Paulina fell, and a group of men gathered to help Taylor pick her up. Taylor remembered giving someone her cell phone so she would have two hands free to help Paulina. She next recalled being in the backseat of a car, seated behind Paulina, who was in the front passenger seat. Taylor noticed they were traveling east on the freeway but was in and out of consciousness during the drive; Paulina was not moving or talking. The next thing Taylor remembered was stumbling arm-in-arm with Paulina toward a motel room while Nuñez was walking behind them. Taylor testified footage from one of the surveillance cameras at the Lemon Tree Motel in Pomona, which showed Nuñez walking behind Taylor, with no indication Paulina was present, was different from what Taylor had remembered.

Once inside the room Taylor and Paulina sat on one of the beds. Nuñez sat next to them and began kissing and fondling Taylor, pulling down her shirt. Taylor, who felt numb, did not move or say anything even though she did not want Nuñez to kiss her. Nuñez then tried to get Taylor and Paulina to touch each other. When Nuñez put Taylor's hand on Paulina's breast, she pulled it away. After he put their faces together so they would kiss and placed Taylor's hand on Paulina's exposed vagina, Taylor, who "felt grossed out," crawled to the other bed. Nuñez followed Taylor and began having sexual intercourse with her. At some point Nuñez placed his fingers inside Taylor's vagina. When Nuñez turned Taylor over to put his penis inside her anus, she said "no" and tried to shove him away. Nuñez then went to the bed where Paulina was lying unconscious and had sexual intercourse with her. He returned to Taylor and had intercourse with her again. Taylor did not move or say anything, explaining she felt "numb, paralyzed, unable

3

to move." Nuñez once again went back to Paulina. After Nuñez finished with Paulina, Taylor climbed into bed with her and fell asleep.

When Taylor awoke the next morning, Paulina was still sleeping; and Nuñez was on the bed with them. Taylor, who was menstruating at the time and using a tampon, rushed to the bathroom to see if she could find it inside of her. Unable to locate it, she yelled at Paulina to wake up. Paulina came into the bathroom, and Taylor explained her tampon was missing but did not discuss the sexual assault. Taylor then asked Nuñez if he had noticed the tampon and what had happened. Nuñez said nothing happened—they had just fallen asleep—although Taylor could not really understand anything else he said because he had a heavy accent.

Nuñez, Taylor and Paulina left the motel to retrieve the girls' car, stopping at a convenience store to get some water. When they got back to the car, the girls could not find the keys. Paulina borrowed Nuñez's phone and called Chris. As they were talking, Taylor took the phone, walked out of earshot of Nuñez and Paulina, and told Chris essentially what had happened. Taylor was pretending nothing was wrong in front of Nuñez because she was afraid he might hurt them if she "came off crazy."

Nuñez took the girls to Paulina's home. When they got there, Josh and Chris came outside and told the girls to go inside. Taylor then called her sister Stephanie G. and asked if she would pick her up. Once they were together, Taylor explained to her sister what had happened.

A few hours later Taylor went to the hospital where she underwent a sexual assault response team examination (SART) and had the tampon, which had lodged in her vaginal canal next to her cervix, removed. While at the hospital Taylor described the previous evening's incident to Pomona Police Officer Adrian Rodriguez and Detective Mario Valencia. Photographs were taken of extensive bruising on her body—including on her back, shoulders, chest, arms and buttocks—as well as a number of scratches. Taylor testified she did not have any bruising or scratches prior to going out that evening, none of the people who helped her when Paulina was on the ground had grabbed her, and nothing had happened after she left the motel room that would have caused the bruises.

4

Although Taylor did not know what caused the bruises, some of them were on areas Nuñez had fondled.

Taylor denied she had consensual sex with Nuñez only to accuse him of rape the next day because she regretted it.

### ii. *Paulina's testimony*

Paulina's testimony about what had happened before she and Taylor encountered the evangelists was largely consistent with Taylor's description of the events. However, Paulina, who was feeling pretty drunk, remembered nothing else before waking up in the motel room to Taylor yelling, "What the fuck, where the fuck are we?" Taylor seemed panicked, upset and angry, but did not tell Paulina what had happened other than her tampon was missing.

When Paulina awoke, she was not wearing her tights or underwear and was missing her glasses. She found her tights and underwear in the bed, but the crotch area was torn. She asked Nuñez what happened, and he told her she and Taylor were drunk so he decided to get a hotel room for them to "sleep it off." During the drive to Paulina's house Nuñez further explained he had tried to take the girls home the prior evening, but Paulina could not remember where to go after she had directed him to leave the freeway.

After Nuñez dropped Paulina and Taylor at Paulina's home, Paulina asked Taylor why she was so angry. Taylor told her Nuñez had raped them. Shortly thereafter Paulina went to the hospital where she was given a SART examination. Photographs were taken of bruises and scratches on Paulina's body, including her right breast and arms. Paulina testified she did not have any of those injuries when she and Taylor had left for the club on March 30, 2012.

### iii. *Other testimony and Nuñez's interview*

Stephanie testified Taylor "was a mess" when Stephanie picked her up. She "looked like she had seen a ghost" and was crying, scared and in shock. Taylor told Stephanie she had been raped; she and Paulina had been drinking and she "was in and out of consciousness," but there were moments she was aware Nuñez was having sex with her and she could see him having sex with Paulina. Taylor also said she needed to go to

5

the hospital to have the tampon removed. Stephanie took Taylor to their father, and he took her to the hospital.

Josh testified Taylor and Paulina appeared hurt and scared when Nuñez dropped them off at Paulina's house. After the girls got out of the car, Chris got in the passenger seat and began talking to Nuñez in Spanish. The conversation became heated. Nuñez began to drive away, and Chris hit him in the face before getting out of the car.

Chris testified Nuñez told him the girls were intoxicated so he checked them into a motel room to sleep it off. When Chris kept questioning Nuñez, he became nervous but insisted he had not done anything wrong. Chris punched Nuñez because he started to drive away with Chris in the car.

Kenneth Takigawa, a criminalist with the Los Angeles County Sheriff's Department, testified Nuñez was a minor contributor of DNA found in epithelian cells on an external anal swab sample taken from Taylor. The sperm fraction of the external anal sample generated a partial DNA profile (13 of 15 loci), and Nuñez was included as a possible contributor of the profile. Statistically, a possible contribution means a random match would occur in one out of 3.9 billion people. With respect to swabs taken from Paulina, the epithelial fraction of the left breast sample included Nuñez as a possible contributor with a statistical probability of the DNA belonging to someone other than Nuñez of one in 13.6 trillion. Nuñez was also a possible contributor of the sperm fraction in a vulva swab with a random match probability of one in four million.

Detective Valencia testified he interviewed Nuñez on August 23, 2012. A recording of the interview was played for the jury. Nuñez denied picking up or helping two drunk girls or taking them to the Lemon Tree Motel in March 2012. Nuñez, who admitted to occasionally staying at the motel, claimed his girlfriend was the only female he had ever taken to the motel.

b. *The defense's case*

The defense theory was that Taylor and Paulina had consented to have sex with Nuñez but regretted it the next day. Nuñez argued in part the surveillance camera footage showed that Paulina, smiling and laughing, was able to walk in high heels except for a

6

brief moment when she stumbled and steadied herself against a wall, undermining her claim she was so intoxicated she was unable to move or resist Nuñez's sexual advances moments later. Additionally, the time shown at the bottom of the surveillance footage was 2:34 a.m., raising the question of what happened during the approximately four hours between the time the girls were in the parking lot before they got to the motel.[3]

Nuñez did not testify on his own behalf, but presented the testimony of Youlian Feng, the wife of the Lemon Tree Motel manager, who assisted with managerial duties. Feng testified Nuñez occasionally stayed at the motel, usually by himself. As far as Feng knew, they have never had to fix the surveillance camera.

### 3. *The Jury Instructions on Rape of an Intoxicated Person*

The jury was instructed with CALCRIM No. 1002 that, to prove the defendant guilty of rape of an intoxicated person, the People must establish the defendant had sexual intercourse with a woman whom he was not then married to, the "effect of an intoxicating substance prevented the woman from resisting" and the defendant "knew or reasonably should have known that the effect of an intoxicating substance prevented the woman from resisting." The instruction further stated, "A person is *prevented from resisting* if she is so intoxicated that she cannot give legal consent. In order to give legal consent, a person must be able to exercise reasonable judgment. In other words, the person must be able to understand and weigh the physical nature of the act, its moral character, and probable consequences. Legal consent is consent freely given and voluntarily by someone who knows the nature of the act involved."

### 4. *The Verdict and Sentence*

The jury convicted Nuñez of two counts of rape and one count of sexual penetration of an intoxicated person with respect to Taylor (counts 3, 4 and 5) and one count of rape of an intoxicated person regarding Paulina (count 2). The jury found Nuñez not guilty of counts 1, 6 and 7.

---

3       The motel registration card indicated the check in date was March 30, 2012 although the credit card receipt reflected the time was 12:45 a.m. on March 31, 2012.

At the sentencing hearing the prosecutor read a victim impact statement prepared by Taylor's family describing the effect of the crimes on her. Taylor, once gregarious with a positive attitude, isolated herself and became so cautious she stopped living the life of a normal teenager.

The court sentenced Nuñez to an aggregate state prison term of 26 years, comprised of the upper term of eight years for counts 2, 3 and 5, to run consecutively, plus a consecutive term of two years (one-third the middle term) for count 4. The court explained the upper terms and full consecutive sentences were warranted, even though the offenses "could have been much more aggravated had [Nuñez] simply abandoned the victims at the motel immediately after he was finished with them," because of "the aggravating factors involving the crime of violence, threat of great bodily harm and the psychological damage that has been inflicted," as well as how vulnerable Taylor and Paulina were and the level of sophistication with which the crimes were committed. The court also observed the case was very close to a "kidnap for purposes of rape," which carried with it "a life exposure."

## DISCUSSION

1. *The Erroneous Admission of Any Hearsay Statements Was Not Prejudicial*

Nuñez contends that the trial court erred in admitting out-of-court statements Taylor had made to Officer Rodriguez and Detective Valencia that were consistent with her trial testimony, but not admissible under the exception to the hearsay rule for prior consistent statements pursuant to Evidence Code section 1236, and, to the extent his attorney failed to object, that he received ineffective assistance of counsel.[4] Nuñez argues admission of the statements was prejudicial because it allowed the jury to hear Taylor's allegations three times, making it more probable the jury would believe they were true, and the jury likely gave those statements more weight than it should have

---

[4] Most of Taylor's statements that Nuñez challenges as inadmissible hearsay were described during the direct and redirect examination of Taylor herself, but a few were included in Officer Rodriguez's direct examination.

8

because Taylor testified her memory was fresher when she spoke to the police at the hospital on March 31, 2012.

Whether his argument is analyzed under the rules of evidence or for ineffective assistance of counsel, Nuñez must demonstrate any error was prejudicial. (See *In re Champion* (2014) 58 Cal.4th 965, 1007.) Reversal is required only if Nuñez can demonstrate he would have obtained a more favorable result without the error. (See *People v. Duarte* (2000) 24 Cal.4th 603, 618-619 [whether admission of hearsay statements is prejudicial is evaluated under standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836-837]; *In re Champion*, at p. 1007 [defendant must demonstrate a "reasonable probability" that absent counsel's failings the result would have been more favorable].) Nuñez cannot meet this standard.

As Nuñez acknowledges, the only disputed issue in the case was consent.[5] The purportedly inadmissible hearsay statements were about inconsequential details of the sexual assaults; they bore little relation to the question whether, as the jury was instructed, Paulina and Taylor were "able to understand and weigh the physical nature of the act, its moral character, and probable consequences." For example, Taylor testified during direct examination she had asked Nuñez what happened the previous evening. On Taylor's second day of testimony, the prosecutor sought to clarify that testimony, asking whether she had told Officer Rodriguez more specifically that she asked Nuñez if they had had sex. Over defense counsel's objection and after reviewing the police report, Taylor testified, as she had earlier, that she had asked Nuñez what had happened and if he had seen the tampon. Other direct testimony Nuñez argues was prejudicial hearsay included Taylor's statements to Officer Rodriguez that Nuñez had tugged on her wrist to get her to the same bed as Paulina, but she was "dead weight," and she had believed the car Nuñez was trying to get them into in the parking lot was Paulina's—which had not previously been elicited. Some of the hearsay statements made on redirect examination

---

5    In weighing Nuñez's defense of consent, of course, the jury properly considered Nuñez's initial denial to the police that he had taken Taylor and Paulina to the motel.

9

(after cross-examination had revealed discrepancies between Taylor's trial testimony and statements she had made to Detective Valencia and Officer Rodriguez) included Taylor's statements to Officer Rodriguez that Nuñez had used a condom even though she did not know if that was actually true and that she had told Nuñez to "stop" during intercourse notwithstanding she had testified she did not actually tell Nuñez to stop except when he attempted anal intercourse.

Given the overwhelming evidence of incapacitating intoxication, it is not reasonably probable Nuñez would have obtained a more favorable outcome had these hearsay statements been excluded. Taylor was so intoxicated she had intercourse with her tampon inserted—something she testified she would never willingly do and that had caused her harm—and suffered significant bruising and scratching during the sexual encounter, injuries she did not have before going into the motel room. Similarly, Paulina was so intoxicated she did not remember anything and woke up severely bruised and scratched. Even the bouncers at the club would not let the girls in because Paulina appeared too intoxicated. The jury also heard testimony from Stephanie and Josh that Taylor told them she and Paulina had been raped. Having details of Taylor's version of the evening corroborated or clarified through mostly consistent statements she had made to Detective Valencia and Officer Rodriguez immediately after the incident did not lend more credibility to Taylor or reinforce her trial testimony more than the cumulative testimony of all the witnesses otherwise did. (See *People v. Hamilton* (1989) 48 Cal.3d 1142, 1168 [even if admission of prior consistent statement was error, it was harmless; "jury would still have heard the positive testimony [ by two witnesses] that defendant was the actual killer, their unequivocal denial that [one of the witnesses] was the killer, and no contrary testimony whatever"].)

The fact the jury found Nuñez not guilty of the forcible rape of Paulina and two of the counts of rape of an intoxicated person (one each as to Taylor and Paulina) does not mean, as Nuñez argues, it was a close case on the charges for which he was convicted. The jury reasonably could have found, because Taylor's recollection of how many times Nuñez had intercourse with her was unclear, there was insufficient evidence to support all

10

of the charged offenses. Similarly, the jury's request to see the surveillance footage of Taylor walking into the motel room does not suggest the out-of-court corroborating statements by Taylor were significant. The surveillance footage was a cornerstone of Nuñez's defense—Nuñez contended it showed Taylor was able to walk and was laughing and smiling; Taylor testified she was only laughing because she had stumbled and was embarrassed. Finally, the jury did not deliberate for a very long time—approximately one day of deliberations for seven counts against two victims. This was not a close case. (Cf. *People v. Perry* (1985) 166 Cal.App.3d 924, 933 ["case against the defendants was reasonably close as demonstrated by the prosecution's reliance on circumstantial evidence, the length of jury deliberations (four days) and the acquittal of defendant Perry as to the Westwood incident"].)

2. *The Trial Court Acted Well Within Its Discretion in Sentencing Nuñez to the Upper Term on Counts 2, 3 and 5*

When a determinate sentencing statute authorizes three possible terms of imprisonment, "the choice of the appropriate term shall rest within the sound discretion of the court." (§ 1170, subd. (b).) "The court shall select the term which, in the court's discretion, best serves the interests of justice." (*Ibid*.) In exercising that discretion, the sentencing court "may consider circumstances in aggravation or mitigation, and any other factor reasonably related to the sentencing decision." (Cal. Rules of Court, rule 4.420(b).)[6] The relevant circumstances may be obtained from the record in the case, the probation report, statements from the victim of the crime and evidence introduced at the sentencing hearing. (§ 1170, subd. (b); rule 4.420(b).) The existence of a single aggravating circumstance is legally sufficient to make the defendant eligible for imposition of the upper term. (*People v. Black* (2007) 41 Cal.4th 799, 816; *People v. Osband* (1996) 13 Cal.4th 622, 728; see *People v. Quintanilla* (2009) 170 Cal.App.4th 406, 413.) Notwithstanding the trial court's broad discretion in crafting a sentence,

---

6      Citations to rule or rules are to the California Rules of Court.

generally reviewable only for abuse, a fact that is an element of the offense may not be used as a reason to impose the upper term. (Rule 4.420(d).)

Nuñez contends the trial court abused its discretion in sentencing him to the upper term for the three convictions for rape of an intoxicated person because it compared the case to kidnapping to commit rape, a crime with a possible life sentence, which was not supported by the evidence or charged by the People. Nuñez also argues the victims' vulnerability, mentioned by the court as a factor, could only be Taylor's age inasmuch as their intoxication was an element of the offense, but there was no substantial evidence Nuñez knew Taylor was only 16 years old.

Even if Nuñez's argument is not forfeited for failure to raise it before the trial court (see *People v. Boyce* (2014) 59 Cal.4th 672, 730-731 ["'[c]laims involving the trial court's failure to properly make or articulate its discretionary sentencing choices' are subject to forfeiture, including 'cases in which the stated reasons allegedly do not apply to the particular case, and cases in which the court purportedly erred because it double-counted a particular sentencing factor, misweighed the various factors, or failed to state any reasons or to give a sufficient number of valid reasons'"]), it is without merit. Although the court made the comments Nuñez now challenges, it clearly articulated several other aggravating factors, amply supported by the evidence, that justified imposition of the upper term: The crimes were violent with a threat of great bodily harm and inflicted significant psychological damage that could "linger[] for the entire lives of these young women." In addition, as the court explained, Taylor and Paulina were particularly vulnerable; and the crimes were committed with a level of sophistication. (See rule 4.421(b)(1), (3) & (8) [aggravating factors relating to the crime]; cf. rule 4.414(a)(4) ["whether the defendant inflicted physical or emotional injury" as one criterion affecting the decision to grant or deny probation].) Any one of these aggravating factors would be a sufficient basis for imposition of upper terms here, and the record fully supports three of them. To the extent the court articulated an impermissible factor to explain its sentencing choice, reversal for resentencing is not required because it is not reasonably probable the court would have chosen a lesser

12

sentence had it known that one or more of the factors upon which it relied were improper. (*People v. Calhoun* (2007) 40 Cal.4th 398, 410.)

       3.  *Sentencing Nuñez to Mandatory, Consecutive Terms Did Not Violate Equal Protection*

      Nuñez was sentenced to consecutive terms for the three counts of rape of an intoxicated person pursuant to section 667.6, subdivision (d), providing that full and separate consecutive terms shall be imposed for rape of an intoxicated person if the crimes involved separate victims or the same victim on separate occasions. (§ 667.6, subds. (d) & (e).) Relying in large part on *People v. Hofsheier* (2006) 37 Cal.4th 1185 (*Hofsheier*), Nuñez contends sentencing him to mandatory, consecutive terms violated his right to equal protection because a person convicted of rape of an unconscious woman (§ 261, subd. (a)(4)) under the same circumstances would not be subject to full-term consecutive sentencing. In *Hofsheier* the Court held mandatory sex offender registration for a 22-year-old defendant convicted of nonforcible oral copulation with a person 16 years of age (§ 288a, subd. (b)(1)) violated his equal protection rights because a same-aged defendant convicted of unlawful sexual intercourse with a 16-year-old minor was only subject to discretionary registration and there was no rational basis for distinguishing between the two categories of sex offenders. (*Hofsheier*, at pp. 1192-1193; see *id.* at p. 1206 ["mandatory lifetime registration of all persons convicted of voluntary oral copulation in violation of [§ 288a, subd (b)(1)] stands out as an exception to the legislative scheme, a historical atavism dating back to a law repealed over 30 years ago that treated all oral copulation as criminal regardless of age or consent"].)

      *Hofsheier* was recently overruled. (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871 (*Johnson*).) In concluding its rational basis analysis in *Hofsheier* had been "[d]emonstrably [w]rong" (*id.* at p. 881), the *Johnson* Court articulated the applicable rational basis test: "Where, as here, a disputed statutory disparity implicates no suspect class or fundamental right, 'equal protection of the law is denied only where there is no "rational relationship between the disparity of treatment and some legitimate governmental purpose."' [Citation.] 'This standard of rationality does not depend upon

13

whether lawmakers ever actually articulated the purpose they sought to achieve. Nor must the underlying rationale be empirically substantiated. [Citation.] While the realities of the subject matter cannot be completely ignored [citation], a court may engage in "'rational speculation'" as to the justifications for the legislative choice [citation]. It is immaterial for rational basis review "whether or not" any such speculation has "a foundation in the record.'" [Citation.] To mount a successful rational basis challenge, a party must "'negative every conceivable basis'" that might support the disputed statutory disparity. [Citations.] If a plausible basis exists for the disparity, courts may not second-guess its "'wisdom, fairness, or logic.'"" (*Ibid.*)

The Court emphasized "the Legislature is afforded considerable latitude in defining and setting the consequences of criminal offenses." (*Johnson*, *supra*, 60 Cal.4th at p. 887.) "'[W]hen conducting rational basis review, we must accept any gross generalizations and rough accommodations that the Legislature seems to have made.' [Citation.] 'A classification is not arbitrary or irrational simply because there is an "imperfect fit between means and ends"' [citation],' or 'because it may be "to some extent both underinclusive and overinclusive"' [citation]. Consequently, any plausible reason for distinguishing between oral copulation and intercourse for purposes of mandatory registration need not exist in every scenario in which the statutes might apply." (*Ibid..*)

Applying that lenient standard here, we can postulate at least two plausible reasons for treating defendants who rape an intoxicated person more harshly than those who rape an unconscious person. First, an unconscious person is not psychologically traumatized during the actual commission of the offense as an intoxicated person may be. In the instant case, Paulina was completely unaware Nuñez had raped her until Taylor told her the next day. She undoubtedly suffered trauma and distress upon learning what had happened, but she did not suffer the contemporaneous physical and psychological trauma of the rape as did Taylor. Second, given the widespread use of drugs and alcohol, rape of an intoxicated person is arguably a more widespread problem, as current news stories suggest, than rape of an unconscious person, a crime clearly more difficult to commit.

14

Thus, rape of an intoxicated person may warrant harsher penalties to deter the crime. To be sure, as Nuñez, argues, an unconscious person is in some respects more vulnerable than an intoxicated one. Taylor was able to dissuade Nuñez from anally raping her and, because she remained conscious for much of the time, could testify against him. It is not for this court, however, to weigh those competing considerations. It is enough that we can identify at least one reasonable basis for treating those who rape intoxicated victims more harshly than those who rape unconscious victims.

## DISPOSITION

The judgment is affirmed.


PERLUSS, P. J.

We concur:


ZELON, J.


FEUER, J.[*]

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.